RICHARD A. MATZA *v.* JANE W. MATZA
(14605)

PETERS, C. J., BORDEN, BERDON, KATZ and PALMER, Js.

Argued March 25—decision released June 29, 1993

*Wesley W. Horton,* with whom was *Alexandra Davis,* for the appellant-appellee (defendant).

*William H. Narwold,* with whom were *Laura W. Ray, William T. Fitzmaurice* and, on the brief, *C. Ian McLachlan,* for the appellee-appellant (plaintiff).

BORDEN, J. The defendant, Jane W. Matza, appeals and the plaintiff, Richard A. Matza, cross appeals, upon our grant of certification,[1] from the judgment of the Appellate Court. The Appellate Court reversed the judgment of the trial court, *Hon. John Ottaviano, Jr.,* state trial referee, dissolving the parties' marriage, and ordered an evidentiary hearing on a motion to withdraw as counsel filed by the defendant's attorney. The principal issues in this appeal are: (1) whether the trial court, *Mihalakos, J.,* who ruled on the motion to withdraw improperly refused to hold an evidentiary hearing on that motion; and (2) whether the trial referee, *Hon. John Ottaviano, Jr.,* improperly drew an adverse inference from the defendant's failure to testify at trial. We reverse the judgment of the Appellate Court.

---

[1] We granted certification to appeal limited to the following issues: "1. Having found that the trial court improperly denied the defendant a hearing before granting her lawyer's motion to withdraw in the midst of trial, should the Appellate Court have simply ordered a new trial?

"2. In a dissolution case, is a challenge to a ruling moot merely because the appellant does not make a general attack on the financial awards?

"3. May the trial court make an adverse inference against a defendant who rests at the end of the plaintiff's case without testifying?

"4. Should the Appellate Court have ruled on the mistrial issue?" *Matza* v. *Matza,* 223 Conn. 915, 614 A.2d 824 (1992).

We also granted certification to cross appeal limited to the following issue: "Was the Appellate Court correct in finding that dissolution litigants have a constitutional right to counsel of their choice?" *Matza* v. *Matza,* 223 Conn. 915, 916, 614 A.2d 824 (1992).

The Appellate Court opinion sets forth the history of this protracted and tortuous litigation: "The underlying dissolution of marriage proceeding was commenced on June 14, 1988. Judgment was rendered on February 21, 1991, thirty-two months later. During the course of this action, three attorneys filed appearances on the defendant's behalf but subsequently withdrew their representation of her. The first, Gary I. Cohen, filed a motion to withdraw from the case in which he claimed that 'difficulties have arisen between counsel and client which make effective representation impossible.'

"On November 29, 1988, Attorney Arnold M. Potash filed an appearance in lieu of Cohen. On December 20, 1988, the court, *Harrigan, J.,* issued temporary alimony and support orders, but vacated those orders on June 27, 1989, after concluding that a financial affidavit filed by the defendant was 'unquestionably inaccurate' and 'misleading.' After Judge Harrigan vacated the temporary alimony and support orders, hearings on a subsequent motion for temporary alimony were held before the court, *F. Freedman, J.* Judge Freedman issued temporary alimony and support orders on August 8, 1989. On November 21, 1989, Judge Freedman ordered the trial to commence on February 15, 1990. On January 10, 1990, the defendant discharged Potash and on January 26, 1990, Attorney J. Daniel Sagarin filed an appearance in lieu of Potash. On January 29, 1990, Judge Freedman referred the case to the Honorable John Ottaviano, [Jr.,] state trial referee, for trial, stating '[t]here will be no further continuances.' Nonetheless, the case again was continued.

"On May 16, 1990, the first day of trial before Judge Ottaviano, the defendant attempted to fire Sagarin. Judge Freedman referred the matter, without objection, to the court, *Mihalakos, J.* Sagarin made an oral motion to withdraw before Judge Mihalakos on the

basis of his representation that the defendant no longer wanted him to represent her. Judge Mihalakos denied the motion and the trial commenced later that day before Judge Ottaviano.

"On May 17, 1990, after one and one-half days of direct examination of the plaintiff, Sagarin began cross-examination. Judge Ottaviano then suspended the trial from May 18, 1990, to May 22, 1990, to allow the parties to conduct settlement negotiations. On May 24, 1990, with no settlement pending, Judge Ottaviano scheduled the trial to resume on July 17, 1990. Judge Ottaviano noted that the defendant had yet to file a financial affidavit and ordered her to do so or be sanctioned.

"The following day, Sagarin delivered a motion to withdraw as counsel together with a supporting memorandum under seal and a letter to Judge Freedman requesting that the motion be assigned to Judge Mihalakos to avoid prejudicing the defendant before Judge Ottaviano. On June 8, 1990, an attorney employed by Sagarin's law firm offered Judge Mihalakos a sealed affidavit in support of the motion. The defendant objected to Sagarin's motion to withdraw and his submission of the affidavit and requested a continuance to prepare a response to the motion. Attorney Dominic Barbara, a New York attorney who had represented the defendant in other matters but had not filed an appearance in this case, also objected to the affidavit's being shown to the plaintiff's counsel, but not to its review by the court. Judge Mihalakos postponed the hearing until June 12, 1990.

"On June 12, 1990, Sagarin pursued the motion to withdraw at a hearing before Judge Mihalakos, arguing that his continued representation of the defendant would result in his participation in the defendant's fraudulent or improper conduct and urging Judge

Mihalakos to conduct an in camera review of his affidavit. After the plaintiff's attorney objected to an in camera review, the defendant stated: 'I . . . definitely do not want this affidavit opened up. I think it's privileged, and if it is submitted I think there should be a hearing without [the plaintiff's attorney] present so we can ask them questions about this affidavit.'

"Judge Mihalakos then recessed and read Sagarin's affidavit, the contents of which may be summarized as follows: The defendant's use of $196,000 in proceeds from the sale of a Florida condominium was in dispute in the case. After reviewing testimony given by the defendant before Sagarin entered the case as her attorney, Sagarin advised the defendant that her prior testimony regarding the use of the proceeds from the condominium's sale was 'not inherently credible.' The defendant then told Sagarin that she had used $75,000 of the proceeds to repay a loan from her father. Sagarin's interview with her father, however, left him skeptical of this claim. Although Sagarin advised the defendant that he would not allow perjurious testimony or fraudulent documents to be admitted at trial, the defendant refused to admit the falsity of her claim and refused to sign a financial affidavit that was prepared with her approval.

"The affidavit further stated the following: On May 14, 1990, Sagarin had received a call from Barbara who claimed that he had been retained by the defendant's family to protect her interests. Barbara stated that he previously had advised the defendant not to tell the 'phony story' about the condominium's proceeds. Sagarin considered the conversation with Barbara to be 'extrinsic proof . . . that the story should not be presented to the court.' On May 17, 1990, Barbara appeared in court in Connecticut and told Sagarin that he had been retained by the defendant's father and was being paid $4000 per day. Sagarin concluded that

because her father could not afford to pay the retainer, the retainer was being paid out of funds hidden by the defendant. From these facts, Sagarin concluded that the defendant's refusal to sign her financial affidavit was based on 'concerns over perjury and fraud.'

"After reviewing Sagarin's affidavit, Judge Mihalakos returned to the bench and granted Sagarin's motion to withdraw as counsel. When the trial resumed on July 17, 1990, the defendant sought another continuance for the purpose of obtaining counsel. Over the plaintiff's objection, Judge Ottaviano granted her a one week continuance. He also granted Barbara's request to appear on the defendant's behalf pro hac vice, provided Barbara retain local counsel. See Practice Book § 24.

"Barbara failed, however, to appear in court on July 23, 1990, or any time thereafter. Instead, Attorney Donald Cantor, the defendant's fifth attorney, appeared on the defendant's behalf and requested a three month continuance and an order that the plaintiff pay him a $50,000 retainer. Judge Ottaviano denied both requests, and trial resumed the following day. The defendant appeared, unaccompanied by an attorney, and requested another continuance for the purpose of engaging counsel, which the court denied. The defendant represented herself throughout the remainder of the trial. On February 21, 1991, Judge Ottaviano rendered judgment dissolving the parties' marriage and entering consequential orders regarding custody, support and visitation of the parties' children, alimony and the division of the parties' assets and liabilities." *Matza* v. *Matza,* 27 Conn. App. 769, 770–74, 610 A.2d 702 (1992).

The defendant appealed to the Appellate Court claiming, inter alia, that: (1) the judge who ruled on the motion to withdraw improperly refused to conduct an evidentiary hearing on that motion; and (2) the trial ref-

eree improperly drew an adverse inference from the defendant's failure to testify. The Appellate Court, having agreed with the defendant on the first claim,[2] remanded the case for a hearing on Sagarin's motion to withdraw. The Appellate Court's rescript provided that "if that motion is denied, the judgment is reversed and the case is remanded for a new trial; if the motion to withdraw is granted, the judgment is affirmed." Id., 780. This appeal and cross appeal followed.

## I

We first address the issue presented by the cross appeal. The plaintiff contends that the Appellate Court improperly concluded that the defendant was entitled to an evidentiary hearing on her attorney's motion to withdraw from the case. We agree.[3]

It is useful to begin by clearing away those issues upon which resolution of this question does not depend. First, the facts of this case do not raise the question of whether a party to a dissolution proceeding has a right to have appointed counsel. Cf. *Lavertue* v. *Niman*, 196 Conn. 403, 493 A.2d 213 (1985). Second, the facts of this case do not raise the issue of whether an indigent party in a civil case is entitled to legal representation at the state's expense. Cf. *Doe* v. *Heintz*, 204 Conn. 17, 526 A.2d 1318 (1987). Finally, the facts of this case do not require us to decide, as a general matter, whether civil litigants have an unlimited constitutional right to counsel of their choice. See *Herrmann* v. *Summer Plaza Corporation*, 201 Conn. 263, 513 A.2d 1211 (1986).

---

[2] The Appellate Court did not reach the defendant's claim that the trial referee improperly drew an adverse inference from her failure to testify.

[3] Because we conclude that the Appellate Court improperly held that the defendant was entitled to an evidentiary hearing on her attorney's motion to withdraw from the case, we need not reach the certified question regarding the Appellate Court's rescript. See footnote 1.

The certified question in the cross appeal, as it relates to the facts of this case, requires us to decide a much narrower issue: whether a party to a marital dissolution action has a constitutional due process right[4] to an evidentiary hearing on a motion to withdraw filed by that party's attorney of choice during trial, where the attorney has filed an affidavit that presumptively demonstrates the attorney's reasonable belief that the continued representation of the client will require a breach of the Rules of Professional Conduct.

"The United States Supreme Court set forth three factors to consider when analyzing whether an individual is constitutionally entitled to a particular judicial or administrative procedure: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' *Mathews* v. *Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)." *Scinto* v. *Stamm,* 224 Conn. 524, 535, 620 A.2d 99 (1993). Application of the *Mathews* test to the present case compels the conclusion that an evidentiary hearing on an attorney's motion to withdraw filed during the trial is not constitutionally required if the attorney

---

[4] Although the defendant purports to rely on both the federal and state constitutions, she has failed to brief adequately or to analyze independently any state constitutional provision. Consequently, we limit our discussion to the relevant federal constitutional claim. *Scinto* v. *Stamm,* 224 Conn. 524, 534 n.9, 620 A.2d 99 (1993).

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law."

reasonably believes that the continued representation of the client will require a breach of the Rules of Professional Conduct.

We begin the inquiry by characterizing the nature of the defendant's interest in the present case. First, we assume without deciding that a litigant in a dissolution proceeding has a general right to be represented by counsel of her choice in circumstances in which the litigant and the attorney agree that such representation is proper and mutually beneficial. See *Herrmann* v. *Summer Plaza Corporation,* supra, 269; *Enquire Printing & Publishing Co.* v. *Reilly,* 193 Conn. 370, 373–74, 477 A.2d 648 (1984).[5] Such an interest, however, is not at stake in this appeal because Sagarin, at the time he filed his motion to withdraw, no longer wished to represent the defendant.

Second, the defendant's interest in this case cannot be adequately characterized without reference to her attorney's rights and professional obligations as her lawyer. The Rules of Professional Conduct, as adopted by the judges of the Superior Court, govern the professional rights and obligations of attorneys practicing within Connecticut. Practice Book, Rules of Professional Conduct, Preface; *Brunswick* v. *Inland Wetlands Commission,* 222 Conn. 541, 553, 610 A.2d 1260 (1992); *Bartholomew* v. *Schweizer,* 217 Conn. 671, 679, 587 A.2d 1014 (1991); 1 Connecticut Practice — Practice Book Annotated (3d Ed. 1989 W. Moller & W. Horton) Rules of Professional Conduct, p. 3 ("rules and comments have the same legal force in Connecticut as any other rules of conduct").

---

[5] Both *Herrmann* v. *Summer Plaza Corporation,* 201 Conn. 263, 513 A.2d 1211 (1986), and *Enquire Printing & Publishing Co.* v. *Reilly,* 193 Conn. 370, 477 A.2d 648 (1984), were appeals from the trial court's denial of motions to admit out-of-state attorneys pro hac vice. Presumably, in these cases, both the party and the attorney seeking to represent that party pro hac vice agreed that such representation was in their mutual interest.

Rule 1.16 of the Rules of Professional Conduct[6] governs and regulates the circumstances in which an attorney should or may withdraw from representing a client. Rule 1.16 (a) governs mandatory withdrawal[7] while rule 1.16 (b) governs permissive withdrawal. Rule 1.16 (b) provides in relevant part: "Except as stated

[6] Rule 1.16 of the Rules of Professional Conduct provides: "DECLINING OR TERMINATING REPRESENTATION (a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

"(1) The representation will result in violation of the rules of professional conduct or other law;

"(2) The lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client; or

"(3) The lawyer is discharged.

"(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, or if:

"(1) The client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;

"(2) The client has used the lawyer's services to perpetrate a crime or fraud;

"(3) The client insists upon pursuing an objective that the lawyer considers repugnant or imprudent;

"(4) The client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

"(5) The representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or

"(6) Other good cause for withdrawal exists.

"(c) When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation.

"(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law."

[7] Attorney Sagarin moved to withdraw pursuant to the doctrines of mandatory *and* permissive withdrawal. Because the Appellate Court treated the motion to withdraw under the rubric of permissive withdrawal, and because we review the judgment of the Appellate Court in this certified appeal, we analyze the claim in the same manner.

in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client, *or if:* (1) The client persists in a course of action involving the lawyer's services that the *lawyer reasonably believes* is criminal or fraudulent . . . ." (Emphasis added.) Rule 1.16 (c) provides: "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."

Subject to the limitation found in paragraph (c), rule 1.16 (b) permits a lawyer to withdraw in two different scenarios. "First, a lawyer may withdraw for *any* or *no* reason, even without client consent, so long as withdrawal can be accomplished without 'material adverse effect' on the client. Second, in the six situations catalogued in the rule, a lawyer may withdraw *even if there is harm to the client.*" (Emphasis in original.) 1 G. Hazard & W. Hodes, The Law of Lawyering (2d Ed. 1992 Sup.) § 1.16.301. "This follows because the rule speaks first to situations where withdrawal will *not* cause harm to the client, and then introduces . . . withdrawal scenarios with the words '*or* if.' " (Emphasis in original.) Id., p. 480 n.2.

Consequently, with permission of the court pursuant to Practice Book § 77, Sagarin was entitled to withdraw[8] from his representation of the defendant in

---

[8] At the time Sagarin filed his motion to withdraw, Practice Book § 77 (d) provided: "Except as provided in subsections (a), (b) and (c), no attorney shall withdraw his appearance after it has been entered upon the record of the court without the leave of the court. No motion for such withdrawal shall be granted until the court is satisfied that reasonable notice has been given to the party or parties represented by the attorney and to other attorneys of record. A motion to withdraw shall include the current address of any party as to whom the attorney seeks to withdraw his appearance."

Practice Book § 77 (d), as amended, now provides: "WITHDRAWAL OF APPEARANCE . . . .

"(d) Except as provided in subsections (a), (b) and (c), no attorney shall withdraw his appearance after it has been entered upon the record of the

this case, *despite* any ensuing harm to the client, if he reasonably believed that continuing to represent her would implicate him in a course of action that was fraudulent and in violation of the Rules of Professional Conduct. See Rules of Professional Conduct 1.2 (d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ."), and 3.3 (4) ("A lawyer shall not knowingly . . . [o]ffer evidence that the lawyer knows to be false. . . ."). The permissive withdrawal rules recognize, therefore, that an attorney may be entitled to withdraw from representing a client, even during

court without the leave of the court. No motion for such withdrawal shall be granted until the court is satisfied that reasonable notice has been given to the party or parties represented by the attorney and to other attorneys of record. A motion to withdraw shall include the last known address of any party as to whom the attorney seeks to withdraw his appearance and shall have attached to it a notice to such party advising him of the following: (1) the attorney is filing a motion which seeks the court's permission to no longer represent the party in the case; (2) if the party wishes to be heard, he or she should contact the clerk's office to find out the date and time of the hearing; (3) the party may appear in court on that date and address the court concerning the motion; (4) if the motion to withdraw is granted, the party should either obtain another attorney or file an appearance on his own behalf with the court and (5) if the party does neither, he will not receive notice of court proceedings in the case and a default judgment may be rendered against him. The attorney's appearance for the party shall be deemed to have been withdrawn upon the granting of the motion without the necessity of filing a withdrawal of appearance."

Although the new rule specifically allows the party to whom the motion is directed to appear in court and be heard, the rule does not provide for an evidentiary hearing. In the present case, the defendant appeared at the hearing on the motion to withdraw, and argued that the affidavit should remain sealed and that the plaintiff should be denied access to it.

We recognize therefore that a party whose attorney has moved to withdraw is entitled to a hearing before the court on that motion. This implies, therefore, that the party is entitled to present oral argument with respect to that motion. Moreover, although this case does not present such a situation, because the comment to rule 1.16 of the Rules of Professional Conduct provides that the attorney's representations to the court "ordinarily" should be sufficient, there may be some cases so egregious and exceptional that an evidentiary hearing may also be appropriate.

the course of a trial, if the attorney reasonably believes that continuing the representation will cause him to violate the Rules of Professional Conduct.

In light of these principles, therefore, we view the defendant's interest much more narrowly than did the Appellate Court. Consequently, we recognize that, once the trial began, the defendant had a right to continued representation by Sagarin only if he did not have a reasonable belief that his continued representation of the defendant would force him to violate the Rules of Professional Conduct. Whether the defendant's interest in these circumstances, however, is of sufficient weight to require, as a matter of constitutional law, an evidentiary hearing on the attorney's motion to withdraw must be determined by analyzing the second and third prongs of *Mathews*. *Scinto* v. *Stamm,* supra, 535.

As noted above, the second prong of *Mathews* requires us to measure the risk of an erroneous deprivation of the defendant's interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. *Mathews* v. *Eldridge,* supra, 348. We first note, in this regard, that the Appellate Court concluded that the allegations made in Sagarin's sworn affidavit, if true, supported a determination "that Sagarin had a reasonable belief that the defendant's affidavit was fraudulent." Similarly, the trial court had concluded that Sagarin's affidavit was sufficient to require withdrawal. These conclusions suggest, therefore, that, under the rules of withdrawal, Sagarin had a reasonable belief that his continued representation of the defendant would require him to violate the Rules of Professional Conduct.

The defendant argues, however, and the Appellate Court concluded, that an evidentiary hearing is required to test the "factual underpinnings" of the affidavit. This

reasoning misconstrues the nature of the defendant's interest and the appropriate inquiry pursuant to a motion to withdraw under rule 1.16 (b). Sagarin was not entitled to withdraw, with the court's permission, only if the proposed financial affidavit of the defendant was, in fact, perjurious. To the contrary, Sagarin would have satisfied the requirements of Rule 1.16 (b) even if the defendant's proposed financial affidavit had not been perjurious or misleading, as long as he had a reasonable belief otherwise. Consequently, the "factual underpinnings" were not critical to the trial court's consideration of the motion to withdraw. In fact, the Appellate Court's emphasis on the accuracy of the underlying facts would read the permissive withdrawal rule out of rule 1.16 (b) because every motion to withdraw would be transformed into an issue of mandatory withdrawal.

The necessity of a full evidentiary hearing on the motion to withdraw is also undercut by reference to the official comments to rule 1.16. These comments note that a client's demand that the lawyer engage in unprofessional conduct places an attorney in a precarious position with regard to his concomitant obligation to protect the secrets of his client. Practice Book, Rules of Professional Conduct 1.16, comment. Although recognizing that the court may wish an explanation from the attorney for the withdrawal, the official comments suggest that the "lawyer's statement that professional considerations require termination of the representation ordinarily should be accepted as sufficient." Id.

As a result, if an attorney invokes this limited explanation for the withdrawal, there would be no underlying facts to consider in a full evidentiary hearing. Although Sagarin chose to file a detailed sealed affidavit with the court for in camera consideration rather than limiting his explanation for withdrawal as sug-

gested by the rules, the existence of the latter option belies the defendant's contention for the necessity of such a hearing.

In light of these practical considerations, and the proper scope of inquiry regarding a motion to withdraw pursuant to rule 1.16 (b), an evidentiary hearing on the motion to withdraw was not necessary to safeguard the defendant's interest in this case. Sagarin, as an officer of the court,[9] submitted an affidavit stating that he reasonably believed that the continued representation of the defendant would cause him to violate the Rules of Professional Conduct. The trial court, after reviewing the affidavit in camera, found no reason to question the veracity of Sagarin's submission. Thus, an evidentiary hearing on the factual underpinnings would have been of little value given Sagarin's reasonable belief regarding the representation.

Moreover, the defendant's interest militates in favor of an evidentiary hearing only if such a hearing would be a more efficacious means of safeguarding that interest than the other procedural protections available to her. *Scinto* v. *Stamm,* 224 Conn. 524, 536, 620 A.2d 99 (1993). In the present case, the defendant was not without recourse to challenge the veracity of Sagarin's affidavit in order to call into question whether Sagarin, in fact, had a reasonable belief that the continued representation would require him to violate the Rules of Professional Conduct. Both the defendant, and her New York attorney, Barbara, were present at the hearing on the motion. Neither individual gave the court any reason to question the veracity of Sagarin's affi-

---

[9] An attorney, of course, would be subject to discipline if he files the affidavit with the intent to mislead the court or if his affidavit is perjurious. Although we do not mean to suggest this is true in the facts of this case, we merely recognize that an attorney making such a representation to the court is likely to be cognizant of his particular professional obligation of candor to the tribunal.

davit. The defendant also failed to file a cross affidavit setting forth facts that would undermine Sagarin's contention that he reasonably believed that continuing the representation would cause him to violate the Rules of Professional Conduct. Moreover, at no point in these proceedings did the defendant claim that Sagarin could not have reasonably entertained such a belief. In light of these additional procedural safeguards, we conclude that the risk of deprivation of the defendant's interest was minor.

The defendant has not cited, nor has our research uncovered, any case in which a court concluded that a civil litigant has a due process right to an evidentiary hearing on a motion to withdraw under rule 1.16. Other courts have suggested, however, in related contexts, that, even if made during the course of the trial, the attorney's good faith assertion that withdrawal is required by the lawyer's ethical obligations is sufficient. For example, in *State* v. *Trapp,* 52 Ohio App. 2d 189, 191, 368 N.E.2d 1278 (1977), the attorney seeking to withdraw informed the court that continuing the representation of the defendant would require him to assist his client in presenting perjured testimony. Despite this assertion, the trial court denied his motion to withdraw. The Ohio Appellate Court reversed, stating that the attorney's statements which were made in good faith "were amply sufficient to require his withdrawal from the case." Id., 194.[10]

---

[10] In a lengthy footnote, the Ohio Appellate Court recognized the limited nature of its inquiry: "The record is not complete enough to answer many questions about this particular conflict between lawyer and client, such as when counsel first became aware of the conflict, what attempts he made to resolve the differences with his client, why counsel waited until voir dire examination before making a record of the problem, and what possibility there was that this same conflict would or would not arise with other counsel in the future. Such additional information could conceivably be preserved for review on appeal by use of in camera examinations of counsel or defendant or both, with or without the presence of the prosecution, as the situa-

Likewise, in *People* v. *Schultheis,* 638 P.2d 8, 13 (Colo. 1981), the Colorado Supreme Court held that if a defendant "insists that counsel present fabricated testimony of a witness, counsel should not reveal to the trial judge the specific reasons for his motion to withdraw." The court concluded that if a lawyer is "confronted with a client who insists upon presenting perjured testimony . . . counsel may only state, in the motion to withdraw, that he has an irreconcilable conflict with his client." Id., 14. The result of such a rule, therefore, is that there will be no factual underpinnings to attack in the evidentiary hearing that the defendant claims in this case.

The third prong of the *Mathews* analysis also does not support the defendant's contention that she was entitled to an evidentiary hearing on Sagarin's motion to withdraw. The judicial system has a significant interest in regulating attorneys and the attorney-client relationship. See, e.g., *Scinto* v. *Stamm,* supra, 531; *Scott* v. *State Bar Examining Committee,* 220 Conn. 812, 817, 601 A.2d 1021 (1992); *Pinsky* v. *Statewide Grievance Committee,* 216 Conn. 228, 232, 578 A.2d 1075 (1990); *Statewide Grievance Committee* v. *Presnick,* 215 Conn. 162, 166–67, 575 A.2d 210 (1990). In so doing, courts have been mindful that the relationship between an attorney and client must involve personal integrity and responsibility on the part of the lawyer and "an equal confidence and trust on the part of the client."[11] *Fisher*

tion might dictate. . . . But we will not speculate about these possibilities beyond the record before us, which is sufficient to disclose [the attorney's] good faith and sound reasoning." *State* v. *Trapp,* 52 Ohio App. 2d 189, 194 n.4, 368 N.E.2d 1278 (1977).

[11] "Here . . . Mr. Tulkinghorn has at once his house and office. He keeps no staff; only one middle aged man . . . who sits in a high pew in the hall and is rarely overburdened by business. He wants no clerks. [Tulkinghorn] is a great reservoir of confidences, not to be so tapped. His clients want *him;* He is all in all." (Emphasis added.) Charles Dickens, Bleak House (Penguin Books 1971 Ed.) c. 10, p. 103.

v. *State,* 248 So. 2d 479, 484 (Fla. 1971). "The relationship between an attorney and his client is highly fiduciary in its nature and of a very delicate, exacting, and confidential character, requiring a high degree of fidelity and good faith." 7 Am. Jur. 2d 188, Attorneys At Law § 119. The entitlement to an evidentiary hearing, therefore, must be considered in light of the state's interest in promoting and preserving the mutual dependence of lawyer and client, and avoiding procedures or rules that undermine it.

The defendant's contention that an evidentiary hearing on Sagarin's motion to withdraw was constitutionally required ignores the devastating impact that such a procedure would have. According to the defendant's claim, an evidentiary hearing would be designed to attack the "factual underpinnings" of Sagarin's affidavit. Presumably, this process would entail the defendant's cross-examination of Sagarin and the introduction of evidence for the purposes of demonstrating that: (1) the defendant's proposed affidavit was accurate and that she was not insisting on committing perjury; and (2) Sagarin was a liar or, at the least, was mistaken as to the factual circumstances underlying the defendant's proposed financial affidavit. On the other hand, Sagarin would be attempting to demonstrate through the submission of evidence and cross-examination of his own client, that she had insisted on his aid in filing a perjurious affidavit.

If, after such a spectacle, the trial court exercised its discretion and chose to deny the motion to withdraw, Sagarin would be obligated to represent the defendant in circumstances devoid of the mutual trust and confidence that is critical to the attorney-client relationship. Such a strained and coerced relationship is inconsistent with the notion of the attorney-client relationship. The court should not perform such a shotgun wedding. See *Fisher* v. *State,* supra, 484. In light of

the limited nature of the defendant's interest, the negligible risk of an erroneous deprivation of that interest, and the cost to the judicial system's ability to regulate effectively the attorney-client relationship, we conclude that such a hearing was not required in this case.

## II

The defendant next claims that the trial referee improperly drew an adverse inference from the defendant's failure to testify at trial. We disagree.

The following facts are relevant to this claim. At trial, the defendant represented herself. Although she cross-examined several of the plaintiff's witnesses, she neither testified nor submitted any evidence after the plaintiff rested. At the conclusion of the trial, both parties were permitted to make closing arguments to the court and to file posttrial memoranda. Both the defendant's closing arguments and her extensive memorandum made repeated and lengthy references to facts not in evidence.

The trial referee, in an eighteen page memorandum of decision, rendered judgment dissolving the parties' marriage and entering consequential orders regarding custody, support of and visitation of the parties' children, alimony, and the division of the parties' assets and liabilities. The memorandum of decision stated: "I find that the parties did not during their marriage years enjoy a high standard of living as claimed by the defendant in her written memorandum and list of claims. I find that her written claims as to the plaintiff's net worth . . . have no support in any evidence submitted by her." The trial referee also noted that he had encouraged the defendant to testify and present her own case, and that he had expressed a willingness to help her elicit testimony from her accountant if she called him as a witness.

Given the lack of any evidence in the record refuting the plaintiff's assertions, the trial referee, therefore, "decline[d] to accept [the defendant's] statements in her post trial writing as to the net worth of the plaintiff." Finally, the memorandum of decision states: "She makes much argument and gives many reasons for finding the plaintiff's testimony and that of his witnesses as not credible. However, he appeared and testified and underwent partial cross-examination by the defendant's counsel before he was permitted to withdraw. *I repeat she refused to testify and thereby voluntarily refused to submit herself to cross-examination. I find adversely to her on this account.*" (Emphasis added.)

The defendant argues, relying on the two sentences emphasized above, that the trial court drew an adverse inference from the defendant's failure to testify that was improper in view of our decision in *Middletown Trust Co.* v. *Bregman,* 118 Conn. 651, 658, 174 A. 67 (1934). The defendant recognizes that, in some circumstances, we have concluded that the failure of a party to produce evidence that is within that party's power to produce, permits an inference that the evidence would be unfavorable to the party's case. See, e.g., *Blake* v. *Blake,* 211 Conn. 485, 493, 560 A.2d 396 (1989); *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). In *Middletown Trust Co.* v. *Bregman,* supra, 657, however, we concluded that the adverse inference rule only applies if "the plaintiff has first made out a prima facie case. The inference drawn from the failure to testify does not supply the place of evidence of material facts and does not shift the burden so as to relieve the party upon whom it rests of the necessity of establishing a prima facie case, although it may turn the scale when the evidence is closely balanced."

The defendant contends that because she was entitled to force the plaintiff to meet his burden

of proof on his complaint, the trial referee was not permitted to draw an adverse inference from her failure to testify. Without reaching the issue of the applicability of the adverse inference rule in these circumstances, we conclude that the defendant's contention is without merit.

We disagree with the defendant's assertion that the trial referee in fact applied the adverse inference rule. The two sentences upon which the defendant hangs her hat must be read in the context of the entire memorandum of decision. Throughout the memorandum of decision, the trial referee repeatedly made reference to the fact that the defendant, in her posttrial arguments and memorandum, had relied heavily on facts outside the record in order to support her claim that the plaintiff's net worth was greater than the amount to which he had testified. In this context, we read the language relied upon by the defendant as merely a recognition by the trial referee that, given her failure to offer evidence that conflicted with the plaintiff's testimony, witnesses and other documentary evidence, there was no evidence to support her claim that the plaintiff's net worth was greater than what he represented at trial.

Even if we were to conclude that the trial referee's memorandum of decision was ambiguous regarding whether the adverse inference rule was in fact applied, the defendant cannot prevail. "[W]e read an ambiguous trial court record so as to support, rather than contradict, its judgment. *Bell Food Services, Inc.* v. *Sherbacow,* 217 Conn. 476, 482, 586 A.2d 1157 (1991). *Lauer* v. *Zoning Commission,* 220 Conn. 455, 470, 600 A.2d 310 (1991). We have repeatedly stated that it is the appellant's responsibility to provide an adequate record for review. See Practice Book § 4061; *Bank of Boston Connecticut* v. *Schlesinger,* 220 Conn. 152, 595 A.2d 872 (1991); *Barnes* v. *Barnes,* 190 Conn. 491, 494, 460 A.2d 1302 (1983). [W]here the factual or legal basis

of the trial court's decision is unclear, the appellant should file a motion for articulation pursuant to Practice Book § 4051. *Thiel Realty Corporation* v. *Culligan Water Conditioning Co.*, 9 Conn. App. 191, 193, 517 A.2d 1052 (1986). *Elliss* v. *Ronning*, 11 Conn. App. 662, 664, 528 A.2d 1174 (1987)." (Internal quotation marks omitted.) *Walton* v. *New Hartford*, 223 Conn. 155, 164-65, 612 A.2d 1153 (1992). In the absence of such a motion in this case, we read the trial referee's memorandum of decision as not having invoked the adverse inference rule. Consequently, the defendant cannot prevail on this claim.[12]

### III

The remaining certified issue is whether the Appellate Court should have ruled on the issue of whether the trial referee improperly refused to grant a mistrial after the defendant's attorney had been permitted to withdraw. We conclude that the Appellate Court should have reached the issue[13] and, in light of our resolution of the other issues in the appeal, we address the merits of the claim.

The Appellate Court, having concluded that the defendant was entitled to an evidentiary hearing on her attorney's motion to withdraw, remanded the case to the trial court for such a hearing. The Appellate Court stated that it therefore was "not necessary to consider the defendant's claim that the withdrawal of counsel was grounds for a mistrial." *Matza* v. *Matza*, supra, 780. We disagree. If, following the evidentiary hearing on the motion to withdraw, the trial court had then granted the motion, the judgment would have been

---

[12] Because we conclude that the trial referee did not apply the adverse inference rule, we do not reach the second certified issue. See footnote 1.

[13] The plaintiff agrees with the defendant that the Appellate Court should have reached the issue, and requests that we address the claim at this time.

affirmed and the mistrial issue would never have been reviewed by the Appellate Court. Consequently, the Appellate Court should have considered the claim.

In light of this reasoning, and because we disagree that the defendant was entitled to an evidentiary hearing, we invoke our supervisory powers to address this issue ourselves rather than remand it for consideration by the Appellate Court. See Practice Book § 4183. The defendant argues that the trial referee improperly refused to grant the defendant's motion for a mistrial following the grant of the motion to withdraw. We disagree.

The following facts are relevant to this claim. The defendant had been represented by three attorneys during the various stages of the proceedings, each of whom withdrew on account of various disagreements with the defendant. At the time the defendant moved for a mistrial, this dissolution action was over two years old. Sagarin's motion to withdraw was granted on June 12, 1990, and the trial was not scheduled to resume until July 17, 1990, thereby allowing the defendant over one month to secure new counsel. On July 17, 1990, the defendant appeared in court without having obtained a new attorney. Despite this history, and over the objection of opposing counsel, the trial referee granted the defendant an additional one week continuance so that she could continue to seek other Connecticut counsel, or so that her out-of-state attorney, Dominic Barbara, could appear pro hac vice. The defendant neither secured in-state counsel nor did she explain why Barbara had refused to file the necessary papers to appear pro hac vice or to attend court with her.

When the trial resumed on July 24, 1990,[14] the defendant represented herself and stated that she was

---

[14] On July 23, 1990, the trial court also held a hearing at the defendant's request so that Attorney Donald Cantor could address the court regard-

prepared to cross-examine the plaintiff. For the remainder of the trial, the defendant actively participated in the trial[15] and received aid from the court in conducting cross-examination. Noting her active participation, the trial referee concluded that "the defendant is not as incapable or as ignorant of the law, court procedure and other matters as she vehemently claimed to be. There was no shyness nor demureness when she got on her feet and articulated in a strong clear voice with good diction her weaknesses and incapabilities. A shrewdness came through as a strong quality of the defendant's character. She showed also tremendous inner strength. She sat unflinchingly throughout days of testimony making copious notes, I believe, on the legal size yellow pads."

The trial referee found that the reasons offered in support of the defendant's repeated requests for additional continuances and a mistrial were not worthy of belief. The trial referee stated in his memorandum of decision that "I find . . . that they were made simply to delay the proceedings and to seek to put the plaintiff to greater unjustified expense."

The trial court has wide discretion in deciding a motion for a mistrial. *Speed* v. *DeLibero,* 215 Conn. 308, 315, 575 A.2d 1021 (1990). The denial of a motion for

---

ing his possible appearance in this matter. Cantor requested as a condition to his appearance that he receive a substantial retainer and a three month continuance. The trial court denied the request noting that "[n]othing has changed."

[15] The transcripts reveal the following nonexhaustive list of examples of her active participation: (1) Participation in the lis pendens hearing; (2) objection to the plaintiff's witness characterization of the plaintiff's goodwill; (3) objection to information contained in one of the plaintiff's exhibits; (4) objection and exception taken to the court's ruling on admission of certain evidence; (5) assertion of attorney-client privilege with respect to Attorney Tannenhauser's testimony; (6) conducting cross-examination of various witnesses; (7) hearsay objections and exceptions with respect to witnesses' testimony; and (8) closing arguments.

a mistrial will be reversed only if the trial court abused its discretion by denying the motion. Id. "[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial and the whole proceedings are vitiated." *Ferino* v. *Palmer*, 133 Conn. 463, 466, 52 A.2d 433 (1947).

After a full review of this record, we conclude that the trial court did not abuse its discretion by denying the motion for a mistrial. The protracted nature of the case, the defendant's course of behavior throughout the proceedings, the factual findings regarding the defendant's intent to delay the proceedings and the resulting prejudice to the plaintiff all amply support the trial court's decision to deny the motion for a mistrial.

On both the appeal and the cross appeal, the judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.