## STATEWIDE GRIEVANCE COMMITTEE v. EDWARD J. BOTWICK
### (14507)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

Argued January 6—decision released July 6, 1993

*Max F. Brunswick,* for the appellant (defendant).

*Darlene Frances Reynolds,* for the appellee (plaintiff).

NORCOTT, J. The principal issue in this appeal is whether the defendant was denied due process of law by having been suspended from the practice of law for a violation of the Rules of Professional Conduct that was not specifically alleged in a grievance committee's presentment. The defendant, Edward J. Botwick, an attorney at law, appeals[1] from the judgment of the trial court after presentment by the plaintiff, the Statewide Grievance Committee, wherein the trial court found that the defendant had violated rules 8.4 (c)[2] and 1.8 (a)[3]

---

[1] The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] Rule 8.4 (c) of the Rules of Professional Conduct provides: "It is professional misconduct for a lawyer to . . .

"(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[3] At the time the plaintiff filed its presentment, rule 1.8 (a) of the Rules of Professional Conduct provided: "CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS (a) A lawyer shall not enter into a business transaction with

of the Rules of Professional Conduct.[4] The trial court ordered that, as to the violation of rule 8.4 (c), the defendant be suspended from the practice of law for one year and, as to the violation of rule 1.8 (a), the defendant be reprimanded.

The defendant claims that the trial court improperly: (1) denied him his right to procedural due process by finding that he had violated rule 8.4 (c) on facts that had not been alleged in the presentment; and (2) found that he had entered into a business transaction with a client in violation of rule 1.8. We reverse the judgment of the trial court with respect to the first issue and affirm the judgment with respect to the second issue.

The following facts are pertinent to our resolution of the defendant's claims. Before June 30, 1989, John Horvat was the mortgagor of real property located in Branford, and the complainant, Vito DiLustro, was the mortgagee. The defendant was the complainant's attorney. When Horvat decided to sell the property and pay off the mortgage, his attorney, Steven P. Hanchuruck, attempted to contact the complainant, who was in Italy at the time, to determine a figure to pay off the mortgage. Hanchuruck instead spoke with the complainant's son, John DiLustro, who referred Hanchuruck to the

a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

"(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

"(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

"(3) The client consents in writing thereto."

[4] The Rules of Professional Conduct are adopted by the judges of the Superior Court and govern the professional rights and obligations of attorneys practicing within Connecticut. *Matza* v. *Matza,* 226 Conn. 166, 175, 627 A.2d 414 (1993).

defendant. Initially, the two attorneys, because of a misunderstanding, failed to agree on the correct pay-off figure. Shortly thereafter, however, the defendant called Hanchuruck and they agreed that $94,365.59 was the correct amount.

The closing occurred on June 30, 1989, while the complainant was still in Italy. Hanchuruck forwarded the defendant a check for $94,365.59 in full payment of the mortgage made out to "Edward Botwick, Trustee." In a letter accompanying the check, Hanchuruck asked the defendant to send him a release of the mortgage "as soon as you are able." The defendant wrote back to Hanchuruck, acknowledging receipt of the check and agreeing to hold it in escrow pending the complainant's execution of the release.

Shortly after the closing, the defendant invested most of the mortgage payoff funds in four second mortgages through M.M.M. Mortgage Company, a shell company that the defendant had formed for the purpose of investing clients' funds in second mortgages. The complainant, who was expected to return from Italy in August, did not return until October, 1989. On November 10, 1989, the complainant went to the defendant's office, where he executed the mortgage release and received interest checks and the trust instruments for three of the second mortgages.[5] Although the complainant then left with the checks and the trust instruments, he came back approximately one hour later, demanding return of the release and giving back the checks and trust instruments. The defendant returned the release to the complainant.

The record at trial includes markedly divergent testimony concerning the interaction between the defend-

---

[5] The defendant testified that he had inadvertently left the trust agreement for the fourth mortgage at home, but that he had told the complainant that he would give it to him the following Monday.

ant and the complainant regarding the closing and the handling of the mortgage proceeds. The complainant testified that, before the closing, he had not spoken to the defendant about the closing or the payoff. He testified that he had spoken only to his son about the closing and understood that his son would receive the mortgage payoff and would put it in the complainant's checking account. The complainant also testified that the defendant had not been authorized to act on his behalf in connection with the closing, and that he had not authorized him to invest the payoff proceeds. He further testified that the first time he had learned that the defendant had the mortgage payoff funds was in August, 1989, that he had been surprised that the defendant had the money, that he had told the defendant that he would need it right away when he returned from Italy, and that he had not authorized the defendant to invest the funds.

The defendant testified, to the contrary, that one week before the closing, he had received a phone call from the complainant in which the defendant confirmed the payoff figure Hanchuruck had given him. The defendant testified that during this conversation, he and the complainant had discussed investing the payoff proceeds. When the defendant explained that he could invest the proceeds through his mortgage company and receive a rate of interest between 12 percent and 17 percent, the complainant enthusiastically approved. The defendant testified that he had explained the details of the mortgage arrangement to the complainant and that he had understood that the complainant would not need the money immediately upon his return from Italy.

The plaintiff filed this presentment of attorney misconduct with the Superior Court, alleging that the defendant had been guilty of misconduct in his dealings with the complainant. The complainant claims that

the defendant had misappropriated the mortgage pay-off funds without the complainant's knowledge or authorization by investing them through the defendant's own mortgage company.[6] The presentment's sole reference to any contact between the defendant and Hanchuruck is contained in paragraph 6, which alleged that Hanchuruck had delivered the check to the defendant, as trustee, to pay off the mortgage. The presentment made no reference to an escrow agreement between Hanchuruck and the defendant.

After an evidentiary hearing on the presentment, the trial court found that there was clear and convincing evidence that the defendant had acted as the complainant's attorney in connection with the closing. The court stated that "[i]t necessarily follows that [the defendant] owed a duty to Attorney Hanchuruck to observe the conditions under which he accepted the pay-off funds." The court concluded that investment of these funds, with or without the complainant's permission, was not a proper escrow arrangement. The court then concluded that the defendant, having agreed to hold the funds in escrow and then having failed to do

---

[6] The presentment made the following pertinent allegations:

"5. The Respondent represented Mr. DiLustro's mortgage interest in connection with the June 30, 1989 closing.

"6. A mortgage payoff check in the amount of $94,365.59 was issued by Attorney Steven P. Hanchuruck to the Respondent as trustee, to pay off Mr. DiLustro's mortgage.

"7. Subsequent to the closing, Mr. DiLustro instructed his son, John DiLustro, to obtain the mortgage payoff check from the Respondent.

"8. The Respondent refused to release the mortgage payoff check to John DiLustro.

"9. The Respondent did not deliver the mortgage payoff check to Mr. Vito DiLustro.

"10. The Respondent misappropriated Mr. Dilustro's mortgage funds without his knowledge or authorization by investing the mortgage payoff funds through his own mortgage company, M.M.M. Mortgage Company.

"11. At a meeting of the Statewide Grievance Committee conducted on October 17, 1990, the Committee concluded that the Respondent violated Rules 1.4, 1.7 (b), 1.8 (a) and 8.4 (c) of the Rules of Professional Conduct."

so, had violated rule 8.4 (c) of the Rules of Professional Conduct. For this violation, the court ordered that the defendant be suspended from the practice of law for one year. With respect to the defendant's allegedly improper business relationship with the complainant, the court found a violation of rule 1.8 (a) because of the absence of a written agreement manifesting the complainant's consent to a business transaction with the defendant. For this violation, the defendant was reprimanded.

I

The defendant first claims that the trial court deprived him of his right to procedural due process[7] by suspending him from practice on the basis of a violation not alleged in the presentment. Specifically, the defendant argues that because he did not have notice of an alleged violation of the escrow agreement with Hanchuruck, it was improper for the court to find a violation of rule 8.4 (c) on this ground. We agree.

The following additional facts are relevant. The words "escrow" or "escrow agreement" do not appear anywhere in the presentment. The only reference in the presentment to Hanchuruck alleged that he had given the defendant a check to pay off the mortgage. At trial, little evidence was offered concerning the escrow agreement between Hanchuruck and the defendant. During the plaintiff's case-in-chief, the only mention of the escrow agreement was on cross-examination of Hanchuruck, who testified that such an agreement had not been specifically stated but had "probably" been implied. On cross-examination and redirect examination of the defendant during the defendant's case-in-chief, the defendant was asked whether he had been obligated to hold the funds in

---

[7] The defendant's due process claim is made pursuant only to the federal constitution.

escrow and whether his investment of them had been a proper escrow arrangement.[8] The defendant indicated that he considered the investment of the funds to be a proper escrow arrangement. Hanchuruck was then recalled during the defendant's case-in-chief and testified that he did not have the legal expertise to form an opinion as to whether the investment of the funds was a proper escrow arrangement, but that he understood that the funds would not be released to the complainant as long as the defendant held the trust agreements. On the basis of this testimony, the plaintiff alleged for the first time in its posttrial brief to the court that a violation of rule 8.4 (c) had occurred because of an improper escrow arrangement, and it was as to that arrangement that the only violation of rule 8.4 (c) was found by the trial court.

We begin our analysis with a review of the legal principles that govern attorney disciplinary proceedings. In part because such actions are "adversary proceedings of a quasi-criminal nature"; *In re Ruffalo,* 390 U.S. 544, 551, 88 S. Ct. 1222, 20 L. Ed. 2d 117, reh. denied, 391 U.S. 961, 88 S. Ct. 1833, 20 L. Ed. 2d 874, modified on other grounds, 392 U.S. 919, 88 S. Ct. 2257, 20 L. Ed. 2d 1380 (1968); attorneys subject to disciplinary proceedings are entitled to due process of law. See *Spevack* v. *Klein,* 385 U.S. 511, 514–16, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967). A license to practice law is a property interest that cannot be suspended without due process. *In the Matter of Saab,* 406 Mass. 315, 323, 547 N.E.2d 919 (1989). Due process, however, is

---

[8] The record indicates that the parties waived final argument before the trial court and agreed to submit simultaneous briefs. The court asked that the plaintiff specify in its brief exactly what acts constituted what violations. It was in its trial court brief that the plaintiff first alleged that the defendant had violated rule 8.4 (c) "[b]y informing Attorney Hanchuruck by letter of July 5, 1989, that Mr. DiLustro's mortgage funds would be held in escrow pending a release, when they were not . . . ." Prior to that reference, that allegation had not been articulated.

a flexible concept, and a determination of the particular process that is due depends on the nature of the proceeding and the interests at stake. *Goldberg* v. *Kelly,* 397 U.S. 254, 268–69, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970).

In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of grievance committees and trial courts with procedural requirements so strict that it becomes virtually impossible to discipline an attorney for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood. See *Statewide Grievance Committee* v. *Presnick,* 215 Conn. 162, 170–71, 575 A.2d 210 (1990).

If a court disciplines an attorney, it does so "not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." *In re Durant,* 80 Conn. 140, 147, 67 A. 497 (1907). Our law historically has vested broad discretion in trial courts with respect to attorney disciplinary proceedings. Long ago, we stated that "courts are, as they should be, left free to act as may in each case seem best in this matter of most important concern to them and to the administration of justice." *In re Peck,* 88 Conn. 447, 457, 91 A. 274 (1914); see also *Statewide Grievance Committee* v. *Rozbicki,* 219 Conn. 473, 483, 595 A.2d 819 (1991), cert. denied, U.S. , 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992) (*Rozbicki II*). Once a complaint has been made against an attorney, "the court controls the situation and procedure, in its discretion, as the interests

of justice may seem to it to require." *In re Peck,* supra, 452; *Statewide Grievance Committee* v. *Rozbicki,* 211 Conn. 232, 238–39, 558 A.2d 986 (1989) (*Rozbicki I*). This discretion, however, must not be exercised at the expense of an attorney's right to procedural due process.

Before discipline may be imposed, an attorney is entitled to notice of the charges, a fair hearing and an appeal to court for a determination of whether he or she has been deprived of these rights "in some substantial manner." *Grievance Committee of the Bar of New Haven County* v. *Sinn,* 128 Conn. 419, 422, 23 A.2d 516 (1941); see also *Statewide Grievance Committee* v. *Presnick,* supra, 169. It is thus imperative that notice of the nature of the charges be "reasonable"; *In the Matter of Ulmer,* 268 Mass. 373, 391, 167 N.E. 749 (1929); and that the attorney be apprised of the charges against him or her before the proceedings commence. *In re Ruffalo,* supra, 551. Otherwise, the proceedings can "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." Id.[9]

The defendant claims that the presentment filed by the plaintiff charged him only with misconduct as a result of his dealings with the complainant, and did not indicate an interest in his dealings with Hanchuruck.

---

[9] An exception to this rule applies when an attorney's conduct is malum in se, because a reasonably prudent attorney would know that such behavior is actionable. See *In re Ruffalo,* 390 U.S. 544, 552–56, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968) (White, J., concurring). Malum in se conduct is that "which all responsible attorneys would recognize as improper for a member of the profession." Id., 555. The defendant conceded at oral argument that if the offense for which he had been disciplined was malum in se, it need not have been in the presentment. On the record before us, we cannot say that the violation found by the trial court regarding the escrow agreement was malum in se, and we therefore consider whether the presentment adequately apprised the defendant of the charges against him.

The proceedings focused on whether the defendant had misappropriated the complainant's funds, not on whether he had violated an escrow agreement with Hanchuruck. The defendant argues, therefore, that because the presentment did not provide sufficient notice of the violation for which he was suspended, his due process rights were infringed.

The plaintiff argues, to the contrary, that the defendant had adequate notice that his handling of the mortgage funds was at issue because the presentment sufficiently described the factual basis underlying the violation of rule 8.4 (c).[10] Specifically, the plaintiff contends that paragraph 10 of the presentment[11] and the allegation in the presentment that rule 8.4 (c) had been violated constituted sufficient notice. At oral argument,

---

[10] The plaintiff also claims that our decision in *Grievance Committee of the Bar of New Haven County* v. *Sinn*, 128 Conn. 419, 23 A.2d 516 (1941), requires us to conclude that the defendant was not deprived of notice because he willingly and without objection answered questions at trial about his ethical obligations with respect to the escrow agreement. We are unpersuaded.

In *Sinn*, the trial court went beyond the specific allegations in the presentment and based its decision on additional facts adduced at trial to which there was no objection. On appeal, we held that the respondent there had specific notice of the acts and conduct under investigation, and that it was not necessary to allege all the details of such conduct. Id., 424–25. *Sinn* is distinguishable, however, because there the presentment alleged, inter alia, that the respondent had engaged a sheriff, made certain demands on him that resulted in a lawsuit and judgment against the sheriff by a third party, and then refused to reimburse the sheriff for the sheriff's costs. Id., 421–22.

The trial court found that although the presentment did not allege that the respondent specifically agreed to pay the sheriff's costs, the respondent had personally requested the services and directed that certain property be seized, and therefore was liable for the consequences of his actions. Id., 423. In *Sinn*, both the presentment and the evidence addressed the respondent's relationship with the sheriff. By contrast, although the presentment here dealt solely with the relationship between the defendant and the complainant, the violation for which the defendant was suspended involved an agreement between the defendant and Hanchuruck.

[11] See footnote 5.

the plaintiff also argued that questioning at trial by the court and counsel for the plaintiff and the defendant was sufficient to give the defendant notice that he had violated the escrow agreement. We agree, nonetheless, with the defendant.

This court long ago set forth the standard that a complaint for misconduct must "be sufficiently intelligible and informing to advise the court of the matter complained of, and the attorney of the accusation or accusations made against him, to the end that . . . the latter may prepare to meet the charges against him. . . . If this condition is satisfied, so that *the accused is fully and fairly apprised of the charge or charges made,* the complaint is sufficient to give him an opportunity to be fully and fairly heard . . . ." (Emphasis added.) *In re Peck,* supra, 453.

In *Rozbicki II,* supra, we stated that the presentment need not refer to specific sections of the Code of Professional Responsibility[12] because, unlike criminal statutes, reference to specific rules does not constitute the only basis for a finding of guilt in attorney misconduct proceedings. Rather, reference to a specific rule simply assists the trial court in drawing its conclusions as to whether, under the totality of the circumstances, professional misconduct occurred. Id., 476–77 n.3. *Rozbicki II* does not, however, mean that a grievance committee or a trial court has carte blanche to examine any evidence and find a violation without regard to whether the presentment gave the defendant adequate notice of the charges against him. Rather, a court may find a violation even if a specific rule has not been cited so long as the attorney subject to discipline has been accorded the full measure of due process required under the particular circumstances of the case.

[12] The Rules of Professional Conduct superseded the Code of Professional Responsibility in October, 1986. *Bergeron* v. *Mackler,* 225 Conn. 391, 397, 623 A.2d 489 (1993).

In *Rozbicki II,* supra, 484, we rejected the defendant's argument that imprecise presentment allegations violated his due process rights because we concluded that the presentment had specifically mentioned the transaction for which a violation was found. Unlike *Rozbicki II,* however, the presentment in this case provided no notice to the defendant that the escrow agreement between himself and Hanchuruck could be the basis of discipline arising out of allegations of misconduct predicated on his relationship with the complainant.

"The charge must be known before the proceedings commence." *In re Ruffalo,* supra, 551. The defendant here was not fully and fairly apprised of the charge that he had violated the escrow agreement because the presentment made no mention of this agreement and because it was a separate and distinct issue from the other allegations of misconduct contained in the presentment. As a result, the defendant had no opportunity to present witnesses to address this specific claim. "How the charge would have been met had it been originally included in . . . [the presentment] no one knows." Id. The lack of notice in the presentment of misconduct stemming from the escrow agreement, and the trial court's reliance on that agreement as the ground for suspending the defendant, deprived him of procedural due process.

## II

The defendant also claims that the trial court improperly concluded that he had violated rule 1.8 by entering into a business transaction with a client. Specifically, the defendant contends that no business transaction occurred because he did not profit by investing the complainant's mortgage payoff funds in his mortgage company. The defendant argues that the investment was merely a method of helping the com-

plainant obtain the highest interest rate on his money, and that no benefit inured to him. We do not agree.

The following additional facts are relevant to this claim. The defendant's mortgage company, M.M.M. Mortgage Company, existed for the purpose of investing his clients' funds in the second mortgage market. As a result of the investment of the complainant's funds, more than $28,000 in interest was earned on the principal. Generally, the only fee the defendant took in connection with this type of investment was through points paid by the borrowers at the inception of the mortgage. In this case, however, because the defendant invested the complainant's funds in an existing mortgage, the defendant made no money on the transaction.

The trial court found that there was clear and convincing evidence that the defendant was acting as the complainant's attorney in connection with the closing. The court also found that the evidence was not clear and convincing that the mortgage payoff funds had been invested without the complainant's permission, but it did determine that the complainant had not given his permission in writing for the investment.[13] The trial court concluded, therefore, that the failure to obtain the complainant's consent in writing amounted to a violation of rule 1.8 (a) (3). See footnote 3.

We agree with the trial court's conclusion that the investment of the mortgage payoff funds constituted

---

[13] Although the complainant testified at trial that the money was not his and that he had instituted foreclosure proceedings against Horvat, we are mindful that the trial court found that there was clear and convincing evidence that the defendant was acting as the complainant's attorney when he accepted the payoff check from Hanchuruck. Therefore, the complainant's beliefs about the funds were immaterial to whether the defendant engaged in a business transaction with the complainant in violation of rule 1.8.

a business transaction within the meaning of rule 1.8 (a). We are not persuaded by the defendant's argument that no business transaction occurred simply because he did not profit financially from it. The evidence clearly substantiated the conclusion that the defendant had invested the complainant's funds in the defendant's mortgage company, that the defendant and the complainant had an attorney-client relationship, and that the defendant had not obtained the complainant's written consent for the investment. Despite the fact that the defendant did not gain financially from this particular transaction, he received the benefit of the use of the complainant's money to buy out the mortgages of other clients, and thus to generate any goodwill that this service might entail.

Even if we accept the defendant's claim that investment of the funds was no more than an attempt to obtain the highest rate of return on the complainant's money while the complainant was out of the country, the conclusion is inescapable that rule 1.8 (a) (3) requires such a use of a client's money to be authorized in writing by the client. Because the complainant did not give written permission, the defendant's investment of the mortgage payoff funds violated rule 1.8 (a) (3).

The judgment is affirmed as to the violation of rule 1.8 (a); the judgment is reversed as to the violation of rule 8.4 (c).

In this opinion the other justices concurred.