## IN THE MATTER OF RICHARD D. ABBOTT.

Suffolk. May 7, 2002. - August 1, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Suspension, Disciplinary proceeding. *Due Process of Law,* Administrative hearing. *Administrative Law,* Proceedings before agency. *Evidence,* Administrative proceeding.

In an attorney disciplinary matter, there was no merit to the attorney's claims that he did not receive adequate notice of all charges against him, that bar counsel was biased and negligent with respect to his case, or that the admission of a videotaped deposition of the complainant infringed the attorney's right to confrontation. [391-393]

Findings and credibility determinations made by the Board of Bar Overseers in an attorney disciplinary proceeding were fully supported by substantial evidence. [393-394]

This court found no merit in conclusory arguments raised by an attorney regarding the conduct of bar counsel and the Board of Bar Overseers during a disciplinary proceeding. [394-395]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on July 11, 2001.

The case was heard by *Cowin,* J.

*Richard D. Abbott,* pro se.

*Jane R. Rabe,* Assistant Bar Counsel.

CORDY, J. Richard D. Abbott appeals from an order of a single justice of this court suspending him from the practice of law in the Commonwealth. The matter came before the single justice on the information and record of proceedings as well as the vote and recommendation of the Board of Bar Overseers (board). The board found that Abbott, as appellate counsel to Oscar Atehortua,[1] had neglected his client's postconviction remedies and had made repeated misrepresentations to both his client and bar counsel concerning his handling of the case. The

---

[1] Oscar Atehortua was convicted of trafficking in cocaine in 1990 and sentenced to from fifteen to twenty years.

board recommended, and the single justice ordered, that Abbott be suspended from the practice of law for two and one-half years.[2] We affirm the decision and order of the single justice.

*Prior Proceedings.*

Bar counsel commenced proceedings against Abbott by filing a petition for discipline on August 31, 1998. Abbott filed a motion to dismiss the petition claiming, inter alia, that bar counsel had negligently failed to interview an interpreter who would have provided exculpatory testimony; had lost an exculpatory letter sent by Abbott to Atehortua in August, 1994; and was generally biased against Abbott. The motion was denied by the board on November 6, 1998, as was Abbott's subsequent motion for reconsideration.

On January 12, 1999, the matter was referred to a hearing committee. A prehearing conference was held on February 22, 1999, at which bar counsel filed a motion to take a videotaped deposition of the complainant, Atehortua, who was incarcerated. Abbott assented to the videotaped deposition and the committee issued an order allowing it. A Spanish interpreter was present to assist Atehortua in the deposition and Abbott and his attorney were allowed to cross-examine the complainant.

Hearings were held on four days between May 28, 1999, and February 8, 2000; and on June 5, 2000, the committee filed its report recommending that Abbott be suspended from the practice of law for two and one-half years. Abbott appealed from the report claiming that the committee ignored and misstated relevant evidence and failed to understand basic appellate procedure. Following oral argument and review of the record, an appeal panel of the board filed a report on March 30, 2001, finding no error in the committee's report and recommending that the board adopt the committee's recommendation for

[2]Abbott had been previously admonished by the Board of Bar Overseers (board) for similar unprofessional misconduct in 1989 when his failure to file an appellate brief in a deportation matter caused his client's appeal to be dismissed. This conduct violated S.J.C. Rule 3:07, Canon 2, DR 2-110 (A) (2), as appearing in 411 Mass. 1318 (1992), and S.J.C. Rule 3:07, Canon 6, DR 6-101 (A) (2) & (3), as appearing in 382 Mass. 783 (1981), and was considered as an aggravating factor in the board's recommendation of discipline in the current matter.

discipline. Abbott filed objections to the appeal panel's report on April 5, 2001.

On May 14, 2001, the board voted to adopt the appeal panel's report and to recommend that Abbott be suspended from the practice of law for two and one-half years. The board's recommendation was based on its conclusion that Abbott had (1) neglected Atehortua's postconviction remedies in violation of S.J.C. Rule 3:07, Canon 6, DR 6-103 (A) (3), as appearing in 382 Mass. 783 (1981) (lawyer shall not neglect legal matter), and S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (1), (2), & (3), as appearing in 382 Mass. 784 (1981) (lawyer shall not fail to seek lawful objectives of client, fail to carry out contract of employment, or prejudice client); (2) made misrepresentations to Atehortua and bar counsel in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4) & (6), as appearing in 382 Mass. 769 (1981) (lawyer shall not engage in dishonesty, fraud, deceit, misrepresentation, or any other conduct that reflects adversely on fitness to practice); and (3) obtained Atehortua's signature by false pretenses on a November 29, 1995, document and had given false testimony under oath to bar counsel in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), & (6), as appearing in 382 Mass. 769 (1981) (lawyer shall not engage in dishonesty, fraud, deceit, or misrepresentation; or engage in conduct prejudicial to administration of justice, or any other conduct that reflects adversely on fitness to practice).

The single justice heard oral argument on July 25, 2001, and on September 12, 2001, issued a memorandum of decision and ordered that Abbott be suspended from the practice of law for two and one-half years. Abbott appealed to the full court claiming, principally, that the proceedings against him violated due process and that the board's findings were unsupported by the evidence.

*Facts.*

The following facts are drawn from the committee's findings which were adopted by the appeals panel and the board.

Abbott was admitted to the bar of the Commonwealth on January 12, 1983, and from 1983 to 1995 worked as a sole

practitioner with a concentration in criminal appellate work.[3] Between 1990 and 1991 Abbott rented space from Attorney Jeffrey Denner in his Newton office and occasionally performed work for Denner as an independent contractor. On or about March 23, 1991, Atehortua retained Denner to represent him in an appeal from his conviction of trafficking in cocaine. Denner was to be paid $9,000 to review the transcript and materials related to Atehortua's trial and evaluate whether there were any issues worthy of appeal. Denner would then be paid an additional $9,000 for preparing the appeal if meritorious issues were found.

In the spring of 1991, Denner asked Abbott to review the Atehortua transcript with him to determine whether there were any issues for an appeal. From this time forward Abbott assumed primary responsibility for Atehortua's case. Following their review, both Denner and Abbott concluded that there "was certainly something worth going forward on" and identified three primary issues for Atehortua's appeal: (1) there were two persons named "Oscar Atehortua" living at the same address, thereby raising an issue of identification; (2) the trial judge erred in denying a motion to suppress; and (3) Atehortua's trial counsel had been ineffective in failing to review wiretap tape recordings for exculpatory evidence.

On August 2, 1991, Atehortua's direct appeal was entered in the Appeals Court. Denner and Abbott then decided to file a motion for a new trial based on a claim of ineffective assistance of counsel. If the motion for a new trial was allowed, they would proceed to trial and forgo the direct appeal; if the motion was denied, they would consolidate the appeal from the denial with the pending direct appeal from the conviction.

On November 27, 1991, Abbott visited Atehortua in prison and informed him that he was going to file a motion for a new trial on Atehortua's behalf. Abbott also informed him that the motion would be at no cost to Atehortua.

In January, 1992, Atehortua wrote to Abbott to complain about the pace of his appeal. Abbott responded on February 3, 1992, that he still planned to file a motion for a new trial based

---

[3]Between October 31, 1995, and November 10, 1998, Abbott was on either inactive or retired status. He returned to active status on November 10, 1998.

on ineffective assistance of counsel. In April, 1992, Atehortua again wrote to Abbott to inquire as to the status of his appeal and to complain about the slow progress. When Abbott informed Denner of Atehortua's complaints sometime shortly thereafter, Denner, who was anxious to be relieved of the case, suggested that Abbott take over the case and file an appellate brief on behalf of the client in exchange for the $9,000 promised for the appeal.

On May 6, 1992, Abbott wrote to Atehortua on "Denner & Associates" letterhead and informed him that the appellate brief "would be a joint product" of Denner and himself. Abbott signed the letter and forged, or caused to be forged, Denner's signature at the bottom of the letter.

On July 29, 1992, Abbott filed a motion for a new trial on Atehortua's behalf claiming that trial counsel had been ineffective in not reviewing the wiretap tape recordings. The trial judge held a hearing on the motion on October 29, 1993, but Abbott presented no evidence, by way of either affidavit or live testimony, from Atehortua's trial counsel. Consequently, the judge ordered that a further hearing be held to consider testimony from Atehortua's trial attorney on the issue of ineffective assistance of counsel. Abbott took no action to schedule a further hearing and none was ever held. Thereafter, the motion for a new trial languished.

While the motion for a new trial was pending, Abbott's strategy regarding the direct appeal was to seek periodic stays. Abbott and Denner had the responsibility of filing monthly status reports with the Appeals Court between December, 1992, and April, 1994. Abbott assumed primary responsibility for filing these reports. Almost from the outset, he failed timely to file the status reports as required. When the January, 1993, status report was not filed, the Appeals Court issued a notice of dismissal pursuant to its Standing Order 17A. When Denner received the notice of dismissal, he contacted Abbott and asked him to file a status report and a motion to reinstate the appeal, which he did. The Appeals Court allowed the motion, vacated the dismissal, and continued the stay. This sequence (failure to file a status report, dismissal, and reinstatement) was repeated five more times until finally, following a June, 1994, dismissal,

Abbott failed to file a late status report and did not move to vacate the dismissal or request a further stay. By this point, Denner had withdrawn from the case and did not receive notice of the dismissal. Because of Abbott's inaction, Atehortua's appeal was dismissed for lack of prosecution on July 29, 1994. Abbott failed to inform Atehortua of the dismissal.[4]

Abbott had little or no contact with Atehortua thereafter until May, 1995, when Atehortua wrote to Denner requesting information on the status of his case, and sent a copy of the letter to Abbott. Abbott did not respond to the letter but Denner contacted Abbott and, on learning that the appeal had been dismissed almost one year earlier, advised him to file a motion to reinstate the appeal. On June 28, 1995, Abbott filed a motion to reinstate the appeal. The motion was denied by the Appeals Court. Abbott failed to notify Atehortua either that he had filed the motion to reinstate the appeal or that it had been denied.

*The Board's Investigation.*

On August 23, 1995, Atehortua wrote to the Office of Bar Counsel complaining that Abbott had abandoned his duty to file an appeal and requesting an investigation of his case. Bar counsel wrote to Abbott on September 1, 1995, requesting information on the matter, to which Abbott replied that Atehortua's case was "proceeding on a good strategic course." On September 29, 1995, Abbott wrote a letter to assistant bar counsel in which he made two claims that the committee later found to be deliberate misrepresentations. First, Abbott claimed that in a recent visit with Atehortua in prison, accompanied by an interpreter, he had had "a meaningful discussion about his case and the proper strategies to pursue (which, as it turns out, I had been pursuing all along)." And, second, he claimed that Atehortua's "complaint had been taken care of" and "[t]his makes your further requests on this case moot."

On October 24, 1995, assistant bar counsel requested that Abbott bring his file on the case to a meeting with her on November 9, 1995. Abbott rescheduled the meeting and instead

---

[4]Meanwhile, in November, 1993, Atehortua's family had paid Abbott $3,000 to file an appellate brief on Atehortua's behalf. While Abbott accepted this payment, he did not write an appellate brief, nor did he take any action to further Atehortua's appeal.

met with Atehortua on November 9, 1995, this time without an interpreter. He presented Atehortua with a document that read: "I, Oscar E. Atehortua, state that I do not want Attorney Richard Abbott to pursue my appeal at this time. I also do not want anyone to see his file concerning me." Atehortua, who is not able to read English well, signed the document without understanding what it said.

On November 20, 1995, Abbott was interviewed by assistant bar counsel, under oath, and stated that he had written and filed an appellate brief on behalf of Atehortua in August or September of 1995. When bar counsel confronted him with the docket sheet showing that the appeal had been dismissed long before that time, Abbott claimed that allowing the dismissal had been part of his "strategy." In a letter dated November 30, 1995, Abbott informed bar counsel that Atehortua was withdrawing his complaint to the board and that Atehortua did not want Abbott to turn his file over to bar counsel. The committee found that these statements by Abbott were intentional misrepresentations.

Abbott subsequently testified before the committee that it had always been his strategy to allow Atehortua's direct appeal to be dismissed, "expand the record" through the motion for a new trial, and then appeal from the anticipated denial of the motion. The committee did not credit this testimony, finding it to be "a *post hoc* rationalization for his neglect." The committee also found that, in an effort to provide evidence of his alleged strategy, Abbott fabricated a letter to Atehortua, dated August 6, 1994, which read in part:

> "I have moved to 60 State Street. Jaime's attorney [Jaime was the codefendant in the cocaine trafficking case] will be pushing [the judge] on the ruling for a Motion for a New Trial. As you know, our ways are more patient and not as aggressive on our Motion. We are not even filing status reports anymore on the appeal."[5]

On December 15, 1995, Abbott retired from the practice of

---

[5]Abbott produced this letter for the first time as an attachment to his motion to reconsider the motion to dismiss the petition for discipline filed on January 13, 1999. It had not been in the client file he had previously surrendered to the board.

law,[6] but did not withdraw as counsel of record from Atehortua's case. By letter dated May 3, 1996, he inquired of Atehortua whether he wanted to proceed on the motion for a new trial, but did not inform Atehortua that he had retired and could no longer represent him. Beginning in June, 1996, Atehortua attempted to get new counsel appointed to represent him on his motion for a new trial. His motion for appointment of counsel was allowed by the Superior Court in August, 1996, but no counsel was assigned to Atehortua until Abbott filed a motion to withdraw on April 28, 1998.

*Discussion.*

A. *Due process.* It is well settled that attorneys facing bar discipline proceedings are entitled to due process protections. *In re Ruffalo*, 390 U.S. 544, 550 (1968). *Matter of Eisenhauer*, 426 Mass. 448, 454, cert. denied, 524 U.S. 919 (1998). Among these protections are the right to fair notice of the charges and the right to be heard. *Id.* at 453-454. *Matter of Ellis*, 425 Mass. 332, 339 (1997). *Matter of Saab*, 406 Mass. 315, 323 (1989). However, as bar discipline proceedings are civil, not criminal matters, *Matter of Jones*, 425 Mass. 1005, 1007 (1997), the respondent is not entitled to the full panoply of constitutional protections afforded to criminal defendants. See *Matter of Eisenhauer, supra* at 454, and cases cited.

Abbott claims that his due process rights were violated because (1) he did not receive adequate notice of all charges against him; (2) bar counsel was biased and negligent with respect to his case; and (3) the admission of a videotaped deposition of the complainant infringed on his right to confrontation.

1. *Notice.* Abbott claims that the petition did not give him adequate notice of what he contends were the "key" elements of the misconduct that he was ultimately found to have engaged in, namely, (1) that he claimed as "strategy" the abandonment of Atehortua's direct appeal only after assistant bar counsel confronted him with the Appeals Court docket entries on November 20, 1995; and (2) that he had Atehortua sign a document that Atehortua did not understand. As to the first, Abbott

---

[6] Abbott returned to active status in November, 1998.

argues that the petition is silent on the subject of when his alleged strategy to forgo Atehortua's direct appeal was formulated. This argument misses the point. The petition for discipline alleges that Abbott improperly permitted his client's direct appeal to be dismissed. This allegation put Abbott on notice that all of his decisions and actions regarding the dismissal of Atehortua's appeal, including the timing and communication of such matters to his client, would be subject to scrutiny by the board. The petition gave adequate notice.

As to the second, Abbott contends he had no notice that he would be sanctioned for having Atehortua sign a document that he did not understand because the petition alleged instead that he had given Atehortua a blank piece of paper to sign. As the single justice aptly noted, "The respondent's argument splits hairs too finely. The petition provided him with ample notice that the document he submitted to bar counsel, as proof that his client did not want to pursue his appeal, was being challenged. That is all due process requires. See, e.g., *Matter of Saab*, *supra* at 323-324 (no due process violation when theory of ethical violation changes); *Matter of Looney*, 13 Mass. Att'y Discipline Rep. 445, 465 (1997) (petition pleaded with sufficient particularity where 'the basic factual allegations were made known')." Abbott's ability to mount an effective defense was not impaired by this discrepancy, as he was put on notice that he was charged with tricking his client into signing a statement that his client never intended to make. He was aware of the thrust and import of the charge and his ability to defend against it did not hinge on whether he wrote the statement in question before or after he presented the document to Atehortua. In these circumstances, Abbott received adequate notice of the allegations against him.

2. *Bias.* Abbott claims that his due process rights were violated because bar counsel failed to interview an interpreter who was present during one of his meetings with Atehortua, thus demonstrating bias and negligence. The witness, according to Abbott, was an impartial observer who would have confirmed Atehortua's endorsement of the "strategy" pursued by Abbott. However, as this court clearly stated in *Matter of London*, 427 Mass. 477, 482-483 (1998), bar counsel has no obligation to interview a respondent's witnesses. Abbott attempts to

distinguish the *London* case by arguing that the interpreter was not "his" witness, as he only knew him for a few hours. Abbott's degree of familiarity with the witness is not relevant. He clearly expected the witness's testimony to be favorable to him and this is sufficient to classify the interpreter as "his" witness. See *id.* at 481-482. Further, in a letter dated April 7, 1998, Abbott reported that, when he spoke to him in March, 1996, the witness claimed to have no memory of the discussion with Atehortua and refused to sign an affidavit. Where the interpreter apparently had no exculpatory evidence to offer, bar counsel's failure to interview him was of no consequence to the proceedings.

3. *Admission of Atehortua's videotaped deposition.* Abbott claims that his rights to confrontation and due process were violated when the committee admitted Atehortua's videotaped deposition in lieu of his live testimony. He claims that while Atehortua was incarcerated at the time of his hearing, this did not render him "unavailable" for purposes of avoiding the requirements of the confrontation clause. However, as the single justice pointed out, "there is no established right to confrontation in a bar discipline proceeding." See *Matter of Segal,* 430 Mass. 359, 364-365 (1999); *Matter of Eisenhauer, supra* at 454. Moreover, the rules of evidence used in the courts are not applicable to bar discipline proceedings, see Rules of Procedure of the Board of Bar Overseers § 3.2 (2002), and the board's own rules permit the admission of videotaped testimony in the circumstances of this case. See Rules of Procedure of the Board of Bar Overseers § 4.15 (2002) ("At the hearing, any part or all of a deposition . . . may be used against any party who was present or represented at the taking of the deposition or who had notice thereof"). Abbott assented to the videotaped deposition, was present at the deposition along with his attorney, and was allowed to cross-examine Atehortua. Abbott's rights were not violated and there was no error in the committee's admission of the videotaped deposition.

B. *Sufficiency of the evidence.* Abbott claims that many of the findings and credibility determinations made by the board were erroneous and unsupported by the evidence. Indeed, he claims that "[v]irtually every finding in [bar counsel's] favor was clearly erroneous . . . ." The standard of review applicable to

the board's findings is whether there was substantial evidence to support the findings. S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997); *Matter of Wise*, 433 Mass. 80, 87 (2000); *Matter of Segal, supra* at 364. Here, the board's findings and decision are fully supported by substantial evidence and we will not disturb its decision.

Abbott argues, in essence, that the committee was unwarranted in crediting Atehortua's testimony over his own and in resolving the conflicting testimony in favor of Atehortua. Such arguments, hinging on the credibility determinations of the committee, generally fall outside the proper scope of our review. See *Matter of Saab*, 406 Mass. 315, 328 (1989), quoting S.J.C. Rule 4:01, § 8 (3), as appearing in 382 Mass. 784 (1980) ("Our rules concerning bar discipline . . . accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing' "); *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995) (hearing committee acts like jury in making credibility finding which may not be rejected unless it can be "said with certainty" that finding was "wholly inconsistent with another implicit finding"). "[A]s long as there is substantial evidence, we do not disturb the board's finding, even if we would have come to a different conclusion if considering the matter de novo." *Matter of Segal, supra* at 364.

C. *Other issues.* Abbott makes several other arguments in his brief that consist largely of conclusory statements and claims for which he gives little or no legal authority. He argues that (1) current bar counsel is bound by previous admissions of prior bar counsel; (2) the charges against him cannot stand because Atehortua stated that he could not remember the substance of several "key" conversations he had with Abbott; and (3) he was denied due process when his most germane points were ignored by the board.

The statements to which Abbott would have current bar counsel bound relate to the number of times an attorney should generally meet with an incarcerated client during the course of appellate representation. As the single justice noted: "[Abbott's] remaining argument, that current bar counsel is bound by 'admissions' made by prior bar counsel, is meritless. [Abbott] has failed to demonstrate either that the statements allegedly made

were admissions or that current bar counsel is somehow bound by them."

As to Abbott's argument regarding Atehortua's failure to recall the substance of certain conversations, this was an issue for the committee to weigh in assessing credibility. The fact that Atehortua had forgotten the details of several of his conversation with Abbott went to his credibility as a witness and the proper weight of his testimony. As discussed above, "our rules concerning bar discipline . . . accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing.' " *Matter of Saab, supra* at 328.

With respect to Abbott's third argument, that he was denied due process when his most germane points were ignored by the board, he cites no legal authority whatsoever and instead recites four questions that he claims were never adequately addressed by the board. His arguments in this respect do not rise to the level of appellate argument as required by Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975), and we therefore decline to address them. See *Commonwealth* v. *Cintron*, 435 Mass. 509, 520 n.5 (2001); *Commonwealth* v. *Salcedo*, 405 Mass. 346, 351 (1989).

*Conclusion.*

As the single justice stated, quoting *Matter of Clooney*, 403 Mass. 654, 657 (1998), "[Abbott's] neglect of Atehortua's case, combined with his various misrepresentations to his client and to bar counsel, and his fabrication of documentary evidence, demonstrate a 'persistent and extended pattern of improper and unethical behavior . . . .' " There is substantial evidence in the record that Abbott (1) failed diligently to pursue postconviction relief for his client; (2) intentionally misrepresented the status of the case to bar counsel; (3) misrepresented the contents of a document to his client in order to induce him to sign it; and (4) fabricated evidence in order to mislead bar counsel. In light of this evidence, we affirm the decision of the single justice, carrying out the recommendation of the board, to suspend Abbott from the practice of law for a period of two and one-half years.

*So ordered.*