IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 13-0138

_____

**FILED**
**June 5, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

GEORGE P. STANTON, III,
Respondent

_____

Lawyer Disciplinary Proceeding
No. 12-03-204

LAW LICENSE SUSPENDED FOR THREE YEARS
AND OTHER SANCTIONS

_____

Submitted: May 7, 2014
Filed: June 5, 2014

Rachael L. Fletcher Cipoletti, Esq.          George P. Stanton, III, Esq.
Chief Lawyer Disciplinary Counsel            *Pro Se*
Office of Disciplinary Counsel               Fairmont, West Virginia
Charleston, West Virginia                    Respondent
Counsel for the Petitioner

JUSTICE KETCHUM delivered the Opinion of the Court.

JUSTICE BENJAMIN concurs and reserves the right to file a separate opinion.

## SYLLABUS

A formal charge that a lawyer has violated the *Rules of Professional Conduct* must be sufficiently clear and specific to inform the lawyer of the alleged misconduct and should identify the *Rules* alleged to have been violated. Nevertheless, a lawyer may be disciplined for an uncharged rule violation if the uncharged violation is within the scope of the misconduct alleged in the formal charge, and if the lawyer is given: (1) clear and specific notice of the alleged misconduct supporting the uncharged rule violation; and (2) an opportunity to respond.

Justice Ketchum:

In this disciplinary proceeding we review a recommended disposition by the Lawyer Disciplinary Board. The Board has recommended, among other sanctions, that lawyer George P. Stanton, III, have his license to practice law suspended for three years. Mr. Stanton challenges the recommended sanctions. Mr. Stanton contends he did not receive due process because the Board found that he violated four *Rules of Professional Conduct*, including making false statements in the course of the disciplinary proceeding, that were not listed in the Statement of Charges that initiated the disciplinary proceeding.

We find that the Statement of Charges gave Mr. Stanton notice that was clear and specific enough to inform him of the alleged misconduct, and that the *Rules* which the Board found Mr. Stanton violated were clearly within the scope of that misconduct. Furthermore, Mr. Stanton was given an opportunity – which he waived – to respond to those allegations of misconduct.

After careful consideration of the record, we find clear and convincing evidence to support the violations of the *Rules of Professional Conduct* as found by the Board. We therefore adopt the Board's recommended sanctions.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

George P. Stanton, III, is a lawyer practicing in Fairmont, West Virginia. He was admitted to the West Virginia State Bar on May 17, 1983, by diploma privilege.

1

Early in his career, Mr. Stanton acted as general counsel for the Department of Corrections.

On February 14, 2013, the Lawyer Disciplinary Board filed a Statement of Charges against Mr. Stanton. The Statement alleged Mr. Stanton violated two of the *Rules of Professional Conduct* in his romantic relationships toward two women (J.L. and K.A.)[1] who were incarcerated at Lakin Correctional Center in West Columbia, West Virginia, when the violations occurred. Specifically, the Statement charged that Mr. Stanton was the lawyer for both women and that he deposited money into each woman's prison trust account, and thereby violated the prohibition in Rule 1.8(e) that a "lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation[.]" The Statement of Charges also alleged that Mr. Stanton had started a personal relationship with K.A. while she was incarcerated; because she was a client in a vulnerable situation, the Statement of Charges alleged Mr. Stanton had engaged in misconduct prejudicial to the administration of justice in violation of Rule 8.4(d).

---

[1] The Statement of Charges also contained allegations concerning a sexual relationship with a third female inmate, J.O., and the placement of money into her prison trust account. However, because the hearing panel subcommittee found no misconduct regarding J.O., we decline to discuss the facts of her case.

Because of the sensitive nature of the facts alleged in this case, we use the initials of the inmates. *See State v. Edward Charles L.*, 183 W.Va. 641, 645 n. 1, 398 S.E.2d 123, 127 n. 1 (1990) ("Consistent with our practice in cases involving sensitive matters, we use the victim's initials.").

Mr. Stanton's defense to the charges, throughout this case, is that he did not represent these women in any official, legal, litigation capacity. Mr. Stanton admitted to having personal relationships with both women, but insists the relationships pre-date their incarceration. The pre-incarceration relationship with J.L. was sexual. As to K.A., Mr. Stanton says they dated before her incarceration and that he knows her family. Mr. Stanton stated under oath that she is "a very attractive woman," and the record contains a letter declaring Mr. Stanton's intention to marry K.A. after she is released from jail. Mr. Stanton took the position that since none of the women were involved in "pending or contemplated litigation," there was nothing wrong with his placing money into their prison trust accounts.

During the prosecution of the charges, it became clear that Mr. Stanton repeatedly gave misleading statements about his legal representation of these women. He would often deny ever representing a woman, but would thereafter admit representing her in some capacity. For instance, Mr. Stanton said in a letter to Disciplinary Counsel, "I really don't believe . . . I've had a significant attorney/client relationship with [J.L.]." During a sworn statement given to Disciplinary Counsel, Mr. Stanton denied representing J.L. as an attorney and insisted he was a friend, saying, "I have never represented her at all other than I did go to that parole hearing in 2008 or nine with her family." But later in his sworn statement, Mr. Stanton admitted to visiting J.L. in a regional jail at some point in 2012, signing into the jail as her attorney and discussing a civil rights suit against the jail with J.L. and another prisoner.

3

On the morning of August 29, 2013, a hearing panel subcommittee of the Lawyer Disciplinary Board conducted a hearing on the allegations against Mr. Stanton and received testimony from witnesses. Mr. Stanton appeared *pro se* at the hearing wearing shorts, a t-shirt and running shoes. After Disciplinary Counsel presented two witnesses, Mr. Stanton announced, "I have no desire to be here any longer. Do I have to be here?" The chairperson of the hearing panel told Mr. Stanton he could "leave at any time," but the panel was going to continue the hearing. A recess was taken at about 10:15 a.m., and when proceedings resumed the chairperson noted that Mr. Stanton had left:

> The Respondent has left the building and has apparently driven off in his truck. He advised the panel as he left that he was going out for a breath of fresh air, but I see we've been on break for about 22 minutes now and he had earlier expressed a desire to absent himself from the hearing, so we're going to proceed.

At the conclusion of the hearing, at approximately 1:00 p.m., the chairperson again stated on the record that Mr. Stanton "absented himself from the hearing after our morning break and has not returned." Members of the hearing panel had "searched the exterior of the building without success" and could not find Mr. Stanton. Disciplinary Counsel collected the notebook of evidence that Mr. Stanton left behind, and later mailed it to him.[2]

---

[2] Mr. Stanton's aberrant conduct did not end with the proceeding before the hearing panel subcommittee. In the middle of his brief to this Court, Mr. Stanton included personal, color photographs of the female inmates. There is no explanation for these photos, and they do nothing to further his argument.

4

The evidence presented to the hearing panel indicated that most inmate mail at Lakin Correctional Center (into or out of the facility) is opened and inspected. Likewise, inmates may make phone calls at limited times (but they cannot receive calls), and most calls are recorded and reviewed by prison employees. However, mail to and from an inmate's lawyer is not monitored. Inmate phone calls to the person who the inmate has designated as her lawyer are also not monitored, and may be placed at almost any time.[3] Further, if an inmate is in segregation or has engaged in misconduct resulting in a loss of telephone privileges, the only phone call she can make is to her designated lawyer.

In early 2012, prison officials searched the cell of an inmate in segregation and found an unsigned note with lawyer George Stanton's office phone number. The note also said, "You can send messages to me through Mom and George, too. If you need anything, just have him call her." This was a "red flag" to prison officials, who perceived that prisoners were using their ability to call Mr. Stanton, in his capacity as a lawyer, to pass unmonitored messages to other prisoners that might jeopardize the security of the institution.

Prison officials reviewed records of phone calls from Lakin Correctional Center to Mr. Stanton and discovered that numerous inmates (including J.L. and K.A.) had designated Mr. Stanton as their lawyer, and had been placing numerous unmonitored

_____

[3] Inmates may not contact their lawyers if the prison is under lock-down, or officials are conducting a count of the prisoners.

5

"legal" phone calls to Mr. Stanton. We recognize – as Mr. Stanton insists we do – that it was the inmates who designated Mr. Stanton as their lawyer, and it was the inmates who initiated the "legal" phone calls. Mr. Stanton insists that he never represented these inmates in any legal capacity.

Regardless of how the phone calls were placed, or how Mr. Stanton came to be designated as the lawyer for so many inmates, prison officials were troubled enough that, on January 9, 2012, the warden officially revoked Mr. Stanton's right to visit with any prisoner.[4] Because the warden found Mr. Stanton's "activity sufficiently unusual" she notified Disciplinary Counsel who began an investigation that resulted in the aforementioned Statement of Charges.

*Findings of the Hearing Panel Subcommittee*

Based upon the testimony and exhibits presented, the hearing panel discerned that Mr. Stanton had not, as listed in the Statement of Charges, violated the prohibition in Rule 1.8(e) against "provid[ing] financial assistance to a client in connection with a pending or contemplated litigation" when he placed money into the female prisoners' prison trust accounts.[5] Even though Mr. Stanton admitted to giving

---

[4] Mr. Stanton had been screened and approved as a "civilian" visitor to the institution, and that approval was revoked. The warden noted, however, that Mr. Stanton could continue to visit any inmate "within the scope of an attorney performing official duties."

[5] Before the hearing panel, when Mr. Stanton stated his intent to leave because he didn't "want to hear any more of it," the chairperson stated:

(continued . . .)

6

money to prisoners, the hearing panel stated it was "unconvinced that this violation occurred."

However, the hearing panel did find Mr. Stanton committed the following six violations of five different *Rules of Professional Responsibility*:

1. Mr. Stanton maintained a romantic relationship with J.L. while she was an inmate, and while he was acting as her lawyer. Mr. Stanton repeatedly presented himself to prison officials as J.L.'s lawyer when, in fact, he was cultivating his relationship with J.L. In so doing, he abused the privileges of prison communication associated with the attorney-client relationship. The hearing panel found Mr. Stanton improperly utilized his status as an attorney to perpetuate the relationship by engaging in unmonitored and unlimited telephone access and written communication with J.L.

The hearing panel noted that Mr. Stanton's lawyer-father had been disciplined by this Court for misusing his attorney status to gain access to female inmates in *Lawyer Disciplinary Board v. Stanton*, 225 W.Va. 671, 695 S.E.2d 901 (2010). This Court said in *Stanton* that, "prison officials should not have to over-analyze the

---

Chairperson: . . . The allegations in front of this panel are that, as an attorney representing inmates, you have put money into their trust accounts at jail.

Mr. Stanton: I'm totally guilty of that. Absolutely.

Chairperson: Well, you know, you could have saved us a drive.

7

motivations of an attorney who seeks to meet with an incarcerated individual whom he states or implies is his client." 225 W.Va. at 677, 695 S.E.2d at 907. The hearing panel therefore perceived that, in examining Mr. Stanton's conduct, it "must assist in protecting the vulnerable, especially those in State custody, from the lustful advances of attorneys as well as maintaining the good relationship between the criminal bar and the state's jail and prison authorities." 225 W.Va. at 680, 695 S.E.2d at 910.

For his conduct involving J.L., the hearing panel found Mr. Stanton violated Rules 8.4(c) and 8.4(d) of the *Rules of Professional Conduct*, which provide:

> It is professional misconduct for a lawyer to: . . .
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
>
> (d) engage in conduct that is prejudicial to the administration of justice;

2. Mr. Stanton initiated a personal relationship with K.A. while she was in prison, and while she was his client. Mr. Stanton repeatedly presented himself to prison officials as the attorney of K.A. However, he improperly used his status as her attorney to further his romantic interests through unmonitored and unlimited telephone access and written communication with K.A. As with the prior finding, the hearing panel found that Mr. Stanton violated Rules 8.4(c) and 8.4(d) of the *Rules of Professional Conduct*.

3. Mr. Stanton pursued and conducted his relationship with K.A. while she was a client in a vulnerable situation. For instance, the record indicated that K.A.

8

repeatedly sought parole, which requires an inmate to show she has a "home plan" and a place to stay after release. Mr. Stanton once rented an apartment for K.A. to establish her home plan, and another time promised K.A. he would fly her to Florida and get her a place close to her family.

The warden of Lakin Correctional Center interpreted Mr. Stanton's conduct in the following way:

> I think Mr. Stanton is a predator. . . . I think Mr. Stanton looks for a certain type of inmate. If you could sit and look at all the inmates that he has and he goes after, he picks a certain stature, a certain color of hair, maybe an eye color . . .
>
> I think he enjoys the hunt. I think he likes the idea of coming in and riding in on the white horse, and I think as quick as he comes in on that white horse, he gets rid of them pretty quick right after. . . .
>
> Women like to talk. They're needy. You get somebody on the phone, they'll talk all day long. It's just how bad things are, how terrible, you know, and then he is coming in like, you know, a knight in shining armor and, "I'll help you here. Oh, I'll put some money on your books. I know you have family that lives all the way down in Florida. I'll make sure I find a place for you." You know, the next thing you know, "I'll make sure I take you down there. I'll make sure you have an apartment."
>
> So he's made himself available to them, as well as they have made themselves available to him. I mean they're just as manipulative as he is and probably more so. But is he a willing participant? Absolutely. He knows what he's doing.

The hearing panel found that Mr. Stanton cultivated a personal relationship with K.A. while she was incarcerated, and while she was a client. Further, the hearing panel found that Mr. Stanton "utilized his status as an attorney to prey upon inmates at

9

the Lakin Correctional Center," and that he was "circumventing security protocols at the facility." The hearing panel concluded that Mr. Stanton's conduct in pursuing and in conducting a personal relationship with a vulnerable client reflects adversely on his character and fitness to practice law and was "conduct that is prejudicial to the administration of justice" in violation of Rule 8.4(d).

4. The hearing panel also found that Mr. Stanton abused his status as K.A.'s lawyer, while she was in a vulnerable position, to attempt to pursue a sexual relationship with K.A. Rule 8.4(g) of the *Rules of Professional Conduct* states it is professional misconduct for a lawyer to:

> have sexual relations with a client whom the lawyer personally represents during the legal representation unless a consensual sexual relationship existed between them at the commencement of the lawyer/client relationship. For purposes of this rule, "sexual relations" means sexual intercourse or any touching of the sexual or other intimate parts of a client or causing such client to touch the sexual or other intimate parts of the lawyer for the purpose of arousing or gratifying the sexual desire of either party or as a means of abuse.

The hearing panel did not find that Mr. Stanton had sexual relations with K.A. However, it concluded that Mr. Stanton's conduct (in attempting to violate Rule 8.4(g) and have sexual relations) did violate Rule 8.4(a) of the *Rules of Professional Conduct*, which states that it is "professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct[.]"

10

5. Rule 8.1(a) of the *Rules of Professional Conduct* states that "a lawyer . . . in connection with a disciplinary matter, shall not: . . . (a) knowingly make a false statement of material fact[.]"

On three occasions in 2011, Mr. Stanton visited K.A. at Lakin Correctional Center. For each visit, Mr. Stanton signed the visitor log as the "attorney" for K.A. These visits were held in a private room where prison officials could not listen.[6] Mr. Stanton also appeared (unsuccessfully) at a parole hearing for K.A.

In November 2011, K.A. was "written up" by prison officials for failing to appear at a class she was scheduled to attend. K.A. stated that at the time of the class she was on a telephone call with her lawyer, Mr. Stanton. More importantly, a few days later Mr. Stanton sent the warden a letter, on his law office stationery, begging forgiveness for K.A. and substantiating that K.A. had been talking to him about legal matters (her home plan following parole) during the class. However, an investigation by the prison found K.A.'s statements were misleading because the phone calls to Mr. Stanton were not initiated until *after* the class had begun.

The record indicates that Mr. Stanton held himself out as K.A.'s attorney in other communications with Lakin Correctional Center. For example, on February 28, 2012, Mr. Stanton called the prison's parole office and identified himself as a lawyer from Fairmont calling on K.A.'s behalf. On March 5, 2012, and again on August 14,

---

[6] Prison visits typically take place in an open room where numerous prisoners meet with numerous visitors. Attorney visits are in a private room with only video surveillance. A guard also waits outside the door.

2013 (two weeks before the hearing before the hearing panel subcommittee), Mr. Stanton sent letters on law office stationery to the prison's parole office asking about K.A.'s parole status. Each time prison officials dealt with Mr. Stanton, he referenced himself as acting as K.A.'s attorney.

However, Mr. Stanton insisted to the Bar's Disciplinary Counsel and to prison officials that he never served as an attorney for K.A. For instance, in a letter to the warden, he said, "I have been extremely careful to not pretend to be any inmate's lawyer, in this case [K.A.]'s lawyer[.]" In an April 25, 2012, letter to Disciplinary Counsel, he said, "I'm not representing anyone at Lakin," while on January 25, 2013, he said, "I don't consider myself [K.A.]'s attorney[.]" Mr. Stanton has repeatedly claimed – including in his brief to this Court and his oral argument – that he never pretended to be K.A.'s lawyer, but said, "if I had meant to deceive prison officials I would have easily gotten away with it."[7]

Because Mr. Stanton persisted in his claim that he was not serving as an attorney for K.A., despite the clear evidence that he was, the hearing panel concluded Mr. Stanton's continued behavior was a knowing, false statement of material fact in connection with a disciplinary proceeding, in violation of Rule 8.1(a). The hearing panel found that although Mr. Stanton "vacillated throughout these proceedings as to whether he was an attorney for [K.A.] and [J.L.], the evidence exceeds that of clear and

---

[7] Likewise, in a January 25, 2013, letter to Disciplinary Counsel, Mr. Stanton said, "Fooling the [Department of Corrections], as a lawyer, is the easiest thing in the world. . . . [I]f I had set out to be unethical, I would have gotten away with it."

convincing evidence that Respondent was [J.L.'s] and [K.A.'s] attorney. Respondent's self-serving statements to the contrary are false statements of material fact."

6. The record indicates that K.A. was placed on work release in early 2013. Unfortunately, K.A. failed a drug screen performed by authorities, and she was returned to incarceration at Lakin Correctional Center.

In April 2013, during the pendency of this disciplinary proceeding, the mail room at Lakin Correctional Center intercepted a letter written by K.A. to another individual. In this letter, K.A. related how she had used drugs and had been returned to incarceration. K.A. further stated that Mr. Stanton had learned of her incarceration, and as a result, "George is so mad at me, he won't accept my phone calls."

Before the hearing panel subcommittee, K.A. testified that the "George" she was referring to in the letter was Mr. Stanton. However, she went on to say that Mr. Stanton later started speaking with her by telephone again, and was "able to continue to communicate with [the parole officer] about [K.A.'s] home plan and trying to get [K.A.] out on parole."

Rule 1.7(b) of the *Rules of Professional Conduct*, which governs conflicts of interest between a lawyer and a client, states:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and

13

(2) the client consents after consultation. . . .

Mr. Stanton had an attorney-client relationship with K.A. The attorney-client relationship requires a lawyer to maintain reasonable communication with a client. *See* Rule 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client); and Rule 1.4 ("A lawyer shall . . . promptly comply with reasonable requests for information."). However, on the basis of K.A.'s letter and testimony, the hearing panel found that Mr. Stanton had refused to communicate with K.A. because of their romantic problems. Mr. Stanton continued to represent K.A. despite the fact that his representation was, as demonstrated, adversely limited by his own, personal, romantic interests. Accordingly, the hearing panel concluded that Mr. Stanton had violated Rule 1.7(b).

On February 7, 2014, the hearing panel subcommittee of the Lawyer Disciplinary Board issued its report and recommended disposition of the charges against Mr. Stanton. The hearing panel found that Mr. Stanton's conduct – particularly when he left the hearing – was disrespectful of the disciplinary process. As sanctions, the panel recommended that this Court suspend Mr. Stanton's license to practice law for three years; that Mr. Stanton be ordered to comply with Rule 3.28 of the *Rules of Lawyer Disciplinary Procedure*, which sets forth duties for suspended lawyers; and that Mr. Stanton pay the costs of the disciplinary proceeding.

Mr. Stanton now objects to the hearing panel's recommended disposition of the charges against him.

14

## II.
## STANDARD OF REVIEW

In *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), this Court took the opportunity to "resolve any doubt" concerning the applicable standard of review in lawyer disciplinary cases. 192 W.Va. at 289, 452 S.E.2d at 380. Syllabus Point 3 of *McCorkle* holds:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

*Accord* Syllabus Point 1, *Lawyer Disciplinary Board v. Santa Barbara*, 229 W.Va. 344, 729 S.E.2d 179 (2012); Syllabus Point 1, *Lawyer Disciplinary Board v. Blevins*, 222 W.Va. 653, 671 S.E.2d 658 (2008). *See also In re L.E.C.*, 171 W.Va. 670, 672, 301 S.E.2d 627, 629 (1983) (Absent a mistake of law or arbitrary assessment of facts, recommended sanctions in legal ethics cases are to be given substantial consideration.)

The above standard of review is consistent with this Court's ultimate authority with regard to legal ethics matters in this State. Syllabus Point 3 of *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), states, "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."

*Accord* Syllabus Point 3, *Lawyer Disciplinary Board v. Artimez*, 208 W.Va. 288, 540 S.E.2d 156 (2000).

Finally, Rule 3.7 of the *Rules of Lawyer Disciplinary Procedure* provides that, in order to recommend the imposition of discipline of a lawyer, "the allegations of the formal charge must be proved by clear and convincing evidence."

## III.
## ANALYSIS

Mr. Stanton's sole legal challenge centers on the differences between the violations alleged in the Statement of Charges, and the violations actually found by the hearing panel subcommittee in its recommended disposition. In short, Mr. Stanton contends he was found guilty of uncharged violations of the *Rules of Professional Conduct.* Mr. Stanton does not cite any legal authority for his challenge, but he does (incorrectly) argue that Disciplinary Counsel failed to specifically charge him with any of the rule violations it now wants him suspended for perpetrating. Mr. Stanton says, "I felt entitled to prepare a defense on only the issues contained in the Statement of Charges."

As previously discussed, the Statement of Charges alleged violations of two *Rules of Professional Conduct*: Rule 1.8(e), pertaining to Mr. Stanton's placement of money in inmate trust accounts; and Rule 8.4(d), pertaining to Mr. Stanton's professional misconduct in pursuing and conducting a relationship with K.A. while she was in a vulnerable situation.

The hearing panel subcommittee stated it was "unconvinced" that Mr. Stanton violated Rule 1.8(e). However, the hearing panel found clear and convincing

16

evidence that Mr. Stanton violated Rule 8.4(d), as was alleged in the Statement of Charges. The record clearly and convincingly supports the hearing panel's finding that Mr. Stanton violated Rule 8.4(d).

Mr. Stanton's challenge, therefore, is to the remaining violations of four *Rules of Professional Conduct*: Rule 1.7(b) [conflict of interest created by a lawyer's own interest]; Rule 8.1(b) [false statements in disciplinary proceedings]; Rule 8.4(a) [attempting to violate a rule of professional conduct, specifically the prohibition in Rule 8.4(g) against sexual relations with a client]; and Rule 8.4(c) [dishonesty; fraud; deceit; or misrepresentation].

Mr. Stanton analogizes the attorney disciplinary process to criminal proceedings. He says that this Court would "expect even a non-attorney municipal judge to know better than to find the town drunk guilty of anything uncharged in a warrant."

As we interpret Mr. Stanton's argument, he asserts that a lawyer cannot be found responsible for violating the *Rules of Professional Conduct* without formal charges first being filed that identify the specific *Rule* that was allegedly violated. He therefore appears to assert that his procedural due process rights have been violated because the Statement of Charges never specifically alleged that he violated these four *Rules of Professional Conduct*.

Disciplinary Counsel argues that due process only requires that the charges against a lawyer be sufficiently clear to inform the lawyer of the misconduct charged. Disciplinary Counsel contends that the allegations in the Statement of Charges against Mr. Stanton arise from his inappropriate relationship with and inappropriate conduct

17

toward two female inmates at Lakin Correctional Center. All of the testimony and evidence supporting the four *Rules* violations related to the same two women and the same circumstances as were charged in the Statement of Charges. All evidence discovered both before and after the Statement of Charges was filed on February 14, 2013, was promptly tendered to Mr. Stanton far in advance of the hearing.

Disciplinary Counsel therefore contends that Mr. Stanton was given full notice of his misconduct leading to the four *Rules* violations. Furthermore, Mr. Stanton was given a full opportunity to be heard and to challenge the evidence – but, he waived that opportunity when he elected to leave in the middle of the hearing before the hearing panel subcommittee. Disciplinary Counsel therefore argues that Mr. Stanton's due process rights were not violated.

After a full review of the convoluted record in this case, as well as the bizarre actions of Mr. Stanton, we conclude that no violation of due process occurred.

"We have recognized that in attorney disciplinary proceedings, a lawyer is entitled to due process of law. Generally, due process requires that the attorney be given notice of the allegations against him and an opportunity to be heard." *Committee on Legal Ethics v. Battistelli*, 185 W.Va. 109, 114, 405 S.E.2d 242, 247 (1991) (citations omitted). Although a lawyer facing discipline is entitled to due process, a determination of the particular process that is due depends on the particular circumstances of the case. *See*, *e.g.*, Syllabus Point 2, *North v. W.Va. Board of Regents*, 160 W.Va. 248, 233 S.E.2d 411 (1977).

18

In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of grievance committees and trial courts with procedural requirements so strict that it becomes virtually impossible to discipline an attorney for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood.

*Statewide Grievance Committee v. Botwick*, 226 Conn. 299, 307, 627 A.2d 901, 906 (1993).

We reject Mr. Stanton's assertion that lawyer disciplinary proceedings are akin to criminal proceedings, and that a formal charge alleging violations of the *Rules of Professional Conduct* must be as specific as a criminal indictment. Proceedings before the Lawyer Disciplinary Board are *sui generis*, unique, and are neither civil nor criminal in character.[8] As one court noted,

---

[8] *See*, *e.g.*, *People v. Kanwal*, 321 P.3d 494, 496 (Colo. 2014) ("the organs and procedures of attorney discipline are unique, or *sui generis*, having been designed for the precise, and sole, purpose of exercising this exclusive jurisdiction and fulfilling this responsibility of the supreme court."); *Ligon v. Dunklin*, 368 Ark. 443, 447, 247 S.W.3d 498, 503 (2007) ("disciplinary proceedings are neither civil nor criminal in nature but are sui generis, meaning of their own kind."); *People v. Sullivan*, 802 P.2d 1091, 1094 (Colo. 1990) ("Attorney discipline proceedings are *sui generis*, and are strictly neither civil actions nor criminal proceedings."); *Yokozeki v. State Bar*, 11 Cal.3d 436, 447, 521 P.2d 858, 865 (1974) ("Proceedings before the State Bar are *sui generis*, neither civil nor criminal in character, and the ordinary criminal procedural safeguards do not apply."); *In re Rerat*, 224 Minn. 124, 127, 28 N.W.2d 168, 172 (1947) ("an action for the discipline of an attorney is neither a civil action nor a criminal proceeding, but is a proceeding *sui generis*, the object of which is not the punishment of the offender, but the protection of the court in the interest of the public good."); *In re Pate*, 107 S.W.2d 157, 162 (Mo. Ct. App. 1937) ("a proceeding to disbar an attorney is neither a civil nor criminal proceeding, it is a proceeding *sui generis*, peculiar in itself, the object of which is not the punishment

(continued . . .)

19

disbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, *sui generis*, and result from the inherent power of courts over their officers. Such proceedings are not lawsuits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. *Ex parte Wall*, 107 U.S. 265, 2 S.Ct. 569, 27 L.Ed. 552 (1882). Thus the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust.

*In re Echeles*, 430 F.2d 347, 349-50 (7th Cir. 1970). We have likewise found that, "Attorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Board v. Taylor*, 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994). As we said in *In re Brown*, 166 W.Va. 226, 232-33, 273 S.E.2d 567, 570 (1980):

Woven throughout our disciplinary cases involving attorneys is the thought that they occupy a special position because they are actively involved in administering the legal system whose ultimate goal is the evenhanded administration of justice. Integrity and honor are critical components of a lawyer's character as are a sense of duty and fairness. Because the legal system embraces the whole of society, the

of the offender but the protection of the court."). *See also*, *In re Chastain*, 340 S.C. 356, 362-63, 532 S.E.2d 264, 267 (2000); *In re Mitan*, 119 Ill.2d 229, 245-46, 518 N.E.2d 1000, 1008 (1987) ("proceedings for reinstatement are *sui generis*, being neither civil nor criminal in nature"); *In re Gillard*, 271 N.W.2d 785, 812 (Minn. 1978) ("judicial removal is neither civil nor criminal in nature, but *sui generis*, designed to protect the citizenry by insuring the integrity of the judicial system.").

20

public has a vital expectation that it will be properly administered. From this expectancy arises the concept of preserving public confidence in the administration of justice by disciplining those lawyers who fail to conform to professional standards.

It is axiomatic that, as an element of due process, a lawyer in a disciplinary matter is entitled to fair notice of the charges of misconduct against him or her. Because the United States Supreme Court articulated this right in *In re Ruffalo*, 390 U.S. 544 (1968), "adequate notice is one of the few procedural due process components universally recognized among the states in attorney disciplinary matters." Samuel T. Reaves, *Procedural Due Process Violations in Bar Disciplinary Proceedings*, 22 J. Legal Prof. 351, 352 (1998).

The question then arises as to what constitutes "fair" or "adequate" notice. In *Lawyer Disciplinary Board v. Barber*, 211 W.Va. 358, 566 S.E.2d 245 (2002) (*per curiam*), this Court addressed a situation where a hearing panel subcommittee found that a lawyer violated a *Rule of Professional Conduct* that had not been specifically charged. The hearing panel found the lawyer had violated certain charged rules, but also found he violated an additional uncharged rule. In *Barber*, we concluded that the lawyer could be held responsible for the uncharged violation because "it was related to or was within the scope of the conduct and rule violations specifically charged." *Id.* at 365, 566 S.E.2d at 252 (*quoting The Florida Bar v. Fredericks*, 731 So.2d 1249, 1253-54 (Fla.1999)).

Because *Barber* was a *per curiam* decision, we did not establish guidelines for what is fair or adequate notice to meet the requirements of due process. We will therefore look to other states to discern principles to guide our decision.

21

The Florida courts have said that a disciplinary proceeding may "properly include evidence of unethical conduct 'not squarely within the scope of the Bar's accusations' because 'it is relevant to the question of the [lawyer's] fitness to practice law and thus relevant to the discipline to be imposed.'" *The Florida Bar v. Vaughn*, 608 So.2d 18, 21 (Fla. 1992). Further, a lawyer can be disciplined for "instances of conduct not specifically charged in the complaint where the conduct was 'clearly within the scope of the Bar's accusations' and the attorney was aware of the rules she was alleged to have violated and 'the nature and extent of the charges pending against her.'" *The Florida Bar v. Fredericks*, 731 So.2d at 1253 (quoting *The Florida Bar v. Nowacki*, 697 So.2d 828, 832 (Fla. 1997)). Hence, "specific findings of uncharged conduct and violations of rules not charged in the complaint are permitted where the conduct is either specifically referred to in the complaint or is within the scope of the specific allegations in the complaint." *Id.*

The Massachusetts courts have held that a petition for discipline is adequate if it put the lawyer "on notice that all of his decisions and actions regarding" the challenged conduct "would be subject to scrutiny by the board." *In re Abbott*, 437 Mass. 384, 392, 772 N.E.2d 543, 549 (2002). Furthermore, "a disciplinary authority may find an attorney's conduct deficient on an entirely different theory" from the one alleged in a petition for discipline. *Matter of Saab*, 406 Mass. 315, 324, 547 N.E.2d 919, 924 (1989). "Because a shift in theory does not violate due process, there certainly is no obligation to notify the respondent about the particular theory under which his case may be considered." *Id*. *See also*, *Zauderer v. Office of Disciplinary Counsel of Supreme Court*

*of Ohio*, 471 U.S. 626, 654-55 (1985) ("That the Board of Commissioners chose to make its recommendation of discipline on the basis of reasoning different from that of the Office of Disciplinary Counsel is of little moment: what is important is that the Board's recommendations put appellant on notice of the charges he had to answer to the satisfaction of the Supreme Court of Ohio.").

The rules of the Kansas Supreme Court require "the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the alleged misconduct." *State v. Caenen*, 235 Kan. 451, 458, 681 P.2d 639, 644 (1984). Due process is met in a disciplinary proceeding when "the facts in connection with the charge are clearly set out in the complaint [so that] a respondent is put on notice as to what ethical violations may arise therefrom." *State v. Turner*, 217 Kan. 574, 579, 538 P.2d 966 (1975). "It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result." *State v. Alvey*, 215 Kan. 460, 466, 524 P.2d 747, 752 (1974). *See also*, *In re Coder*, 272 Kan. 758, 35 P.2d 853 (2001).

Finally, the courts of Connecticut have found that the "one supreme requisite" of a complaint of misconduct against a lawyer is that it must

> be sufficiently intelligible and informing to advise the court of the matter complained of, and the attorney of the accusation or accusations made against him, to the end that . . . the latter may prepare to meet the charges against him. . . . If this condition is satisfied, so that the accused is fully and fairly apprised of the charge or charges made, the complaint is sufficient to give him an opportunity to be fully and fairly heard[.]

23

*State v. Peck*, 88 Conn. 447, 453, 91 A. 274, 276 (1914). The complaint need not make a specific reference to the rule alleged to be violated. "[A] court may find a violation even if a specific rule has not been cited so long as the attorney subject to discipline has been accorded the full measure of due process required under the particular circumstances of the case." *Statewide Grievance Committee v. Botwick*, 226 Conn. at 310, 627 A.2d at 908.

While notions of due process attend the various stages of lawyer disciplinary proceedings, "technicalities of pleading or procedure do not." *Complaint of J.G.*, 392 N.W.2d 544, 545 (Minn. 1986). Accordingly, a lawyer disciplinary board that has been "apprised of misconduct" by a lawyer "need not limit itself to the charges or characterization of misconduct" initially charged but may, upon "review and investigation, choose to modify the nature of the disciplinary proceedings, as long as it provides the respondent with notice of the alleged misconduct and an opportunity to respond." *Romero-Barcelo v. Acevedo-Vila*, 275 F. Supp. 2d 177, 197 (D.P.R. 2003).

Distilling these observations down into applicable principles, we conclude that in lawyer disciplinary proceedings, a lawyer is entitled to due process of law. Generally, due process requires that a lawyer be given fair notice of the misconduct alleged against him or her, and an opportunity to respond and be heard. However, a determination of the particular process that is due depends on the particular circumstances of the case.

We therefore hold that a formal charge that a lawyer has violated the *Rules of Professional Conduct* must be sufficiently clear and specific to inform the lawyer of

24

the alleged misconduct and should identify the *Rules* alleged to have been violated. Nevertheless, a lawyer may be disciplined for an uncharged rule violation if the uncharged violation is within the scope of the misconduct alleged in the formal charge, and if the lawyer is given: (1) clear and specific notice of the alleged misconduct supporting the uncharged rule violation; and (2) an opportunity to respond.

The formal Statement of Charges against Mr. Stanton, which is eleven pages in length, was sufficiently clear and specific to inform him of the misconduct for which the hearing panel recommends he be disciplined. The Statement of Charges extensively details Mr. Stanton's inappropriate relationship with and inappropriate conduct towards J.L. and K.A. The Statement of Charges notifies Mr. Stanton that he was holding himself out to prison authorities as the attorney for both women while simultaneously denying that he had any attorney-client relationship. Furthermore, although Mr. Stanton continued his misconduct after the filing of the Statement of Charges, Disciplinary Counsel promptly provided Mr. Stanton with discovery supporting the continuing misconduct and notified him of the intent to introduce that evidence against him.

Additionally, Mr. Stanton was provided with an opportunity to object to or challenge the evidence and to cross-examine witnesses. However, he essentially waived this opportunity when, after the testimony of the first two witnesses, he abandoned the proceeding before the hearing panel subcommittee to go "out for a breath of fresh air" and never returned, leaving his evidence notebook behind.

25

Under the record in this case, we find that the hearing panel subcommittee properly found Mr. Stanton guilty of misconduct that was fully and fairly alleged in the Statement of Charges.[9] We therefore find no procedural due process violation.

Rule 3.7 of the *Rules of Lawyer Disciplinary Procedure* requires that the charges against a lawyer must be proven by clear and convincing evidence. After reviewing the record presented, we are convinced that Mr. Stanton violated Rule 1.7(b); Rule 8.1(b); Rule 8.4(a); Rule 8.4(c); and Rule 8.4(d), of the *Rules of Professional Conduct*. His actions were knowing and intentional, particularly in light of the fact that he was, at one time, general counsel for the Department of Corrections and would have knowledge of the rules and regulations of West Virginia prison facilities. Mr. Stanton's misconduct not only demonstrates a lack of judgment, but was a clear violation of the *Rules of Professional Conduct*.

The hearing panel subcommittee noted that, while Mr. Stanton had no prior disciplinary record, there were a number of aggravating factors that influenced the hearing panel's recommendation of sanctions. The hearing panel found the following aggravating factors: 1. Dishonest or selfish motive; 2. A pattern of misconduct; 3. Multiple offenses; 4. Obstructive behavior during disciplinary proceedings; 5. Refusal to acknowledge wrongful nature of conduct; 6. Vulnerability of victims; 7. Substantial

---

[9] In future cases, however, out of an abundance of caution, Disciplinary Counsel and the investigative panel of the Lawyer Disciplinary Board should seek to both fully detail all allegations of misconduct in the formal charge, and seek an amendment to the formal charge when additional allegations of violations become available.

experience in the practice of law; and 8. Continued pattern of misconduct after the filing of the disciplinary proceedings.

Based upon the totality of Mr. Stanton's misconduct, and the aggravating factors in this case, for the public to have confidence in our disciplinary and legal systems, lawyers who engage in the type of conduct exhibited by Mr. Stanton must be severely sanctioned. A license to practice law is a revocable privilege; when the privilege is abused, the privilege should be revoked or suspended.

## IV.
## CONCLUSION

We adopt the recommendation of the hearing panel subcommittee and impose the following sanctions upon George P. Stanton, III:

1. Mr. Stanton's license to practice law shall be suspended for a period of three years;

2. Mr. Stanton shall comply with the duties for suspended lawyers set out in Rule 3.28 of the *Rules of Lawyer Disciplinary Procedure*; and

3. Mr. Stanton shall pay the costs of this disciplinary proceeding.


Law License Suspended For Three Years and Other Sanctions.

27